### Kenneth L. CRAWFORD

v.

### ROADWAY EXPRESS, INC.

Civ. A. No. 78–1311.

United States District Court,
W. D. Louisiana,
Shreveport Division.

Feb. 26, 1980.

Henry C. Walker, IV, Shreveport, La., Timothy R. Fischer (formerly with H. Walker), Northwest Louisiana Legal Services, Inc., Shreveport, La., George M. Strickler,· Jr., New Orleans, La., for plaintiff.

Walter F. Clawson, Schober, Clawson & Brabham, Shreveport, La., John N. Childs, Buckingham, Doolittle & Burroughs Co., L. P. A., Akron, Ohio, for defendant.

## OPINION

STAGG, District Judge.

On September 5, 1979, at the close of a five-day trial, this court ruled that defendant Roadway Express Company (Roadway) violated the civil rights of plaintiff Kenny L. Crawford by retaliating against him for participating in an Equal Employment Opportunity Commission (EEOC) hearing in Dallas. The Dallas hearing had been called to investigate charges of racial discrimination at Roadway's Shreveport terminal, and Crawford, a white employee, gave testimony at the hearing that tended to support the charges. Upon Crawford's return to Shreveport, he was subjected to persistent harassment by Roadway management, one of whom stated that "Kenny's just another nigger."

Having found liability, the court reserved ruling on the issue of damages to give the parties an opportunity to settle that issue. No settlement has been reached, so the court must now render an appropriate award. First, however, it would be helpful to summarize and supplement the court's findings of fact and conclusions of law.[1]

## I. FINDINGS OF FACT

Plaintiff Kenny L. Crawford was originally hired as a casual worker at Roadway's Dallas Terminal, and became a full-time employee on November 4, 1968. In September of 1973, Crawford began working at the Shreveport Terminal, and is still employed there.[2] Throughout his employment in Dallas, and until March of 1977 in Shreveport, Crawford worked as a "Pickup and Delivery", or "P & D" truck driver.

On March 1, 1977, Crawford and several other Roadway employees went to Dallas to give testimony to the EEOC after charges of discrimination were filed by several black employees. When asked why he went to testify, Crawford stated that he had seen numerous examples of racial·discrimination at the terminal and wanted to help remedy the situation. For example, several witnesses referred to a common saying among Roadway management that epitomized their general attitude: "Niggers and rosebushes go together." This statement refers to the Roadway supervisors' then-current practice of disproportionately assigning blacks to load and unload Tyler rose crates, a difficult, dirty job.[3]

---

1. Though the findings of fact and conclusions of law contained in this opinion follow the basic outline of the court's ruling from the bench, they differ in some respects from those delivered from the bench. Any inconsistencies between the ruling from the bench and this opinion are to be governed by this opinion.

2. Crawford testified that he has remained an employee at Roadway despite the constant harassment because he is unwilling to give up his seniority.

3. Tyler rose crates are large boxes containing dirt and rosebushes which are shipped from Tyler, Texas. Each box weighs from 60 to 80 pounds, and is extremely bulky and dirty. The discriminatory practice of assigning blacks to this job has now been alleviated through the institution of a rotating system where all employees must occasionally take part. However,

Shortly after returning to Shreveport from the EEOC hearing, Crawford was confronted by John Davis, a Roadway Terminal Operations Manager (TOM), who told him that those who went to Dallas would be fired. Crawford was also told at various times by TOM's Poston and Gardner, and Terminal Manager Charles Cates, that any minor mistake would cost him his job. These "greetings" set the stage for a persistent course of harassment that culminated in Crawford's hospitalization and treatment for irritable bowel syndrome and extreme nervousness, which Crawford's doctors established was caused by his response to his volatile work situation.[4]

Each of Roadway's witnesses, all of whom were management personnel, denied that any such statements were ever made to Crawford or to the other employees who testified in Dallas. Further, the management witnesses denied even knowing who went to the Dallas hearing until a company attorney quizzed them about it in April or later. However, several witnesses stated that there were "rumors" around the dock shortly after the EEOC hearing. The Roadway witnesses' uniform, almost identical, answers regarding this issue strains the credulity of a trial judge. The Roadway terminal is a community in microcosm where nearly everyone hears what is happening and discusses it. The court believes the plaintiff's witnesses who testified that the trip to Dallas and the participants were well known. The court finds that Roadway management knew the identity of the Dallas witnesses almost immediately and that Roadway personnel made the threatening comments attributed to them by Crawford's witnesses.

About one week after the Dallas hearing, Crawford exercised his seniority privileges by switching job functions from "P & D" driver to "hostler". A hostler is a dock employee who, among other duties, backs trucks up to the dock for loading after checking the truck to make sure it is loadworthy. Crawford was again "greeted" to his new job on the dock by Bill Johnson, another TOM, who told Crawford to "get your goddamn ass off my dock". Around this time, Charles Cates told Crawford, "I'm not gonna have to fire you, you're gonna fire yourself."

Beginning with his job on the dock as a hostler, and continuing through his later jobs as dock checker and fork lift driver, Crawford was subjected to extensive on-the-job harassment. Crawford's witnesses gave many examples of such treatment, all of which were denied by Roadway witnesses. The court resolves this credibility issue against Roadway, and cites the following instances as a few examples of Roadway's retaliatory actions:

1. The record shows that while Roadway management was harassing Crawford on the dock, it was also "building a file" on him through oppressive surveillance which led inevitably to many questionable warning letters[5] and innumerable verbal warnings. It is probably true, as Roadway contends, that Crawford is not an exemplary employee. His work record reveals a relatively large number of write-ups concerning various deficiencies in his work patterns even before his testimony in Dallas. However, the number of these write-ups and the considerable detail written in them shows a marked change after the Dallas EEOC hearing.

In examining Crawford's file, identified as Defendant's Exhibit No. D–13, the court finds that from the beginning of 1976 until May of 1977, Crawford received only one warning letter. Beginning in May of 1977, however, just two months after Crawford's return from Dallas and after persistent harassment on the dock, Crawford received nine warning letters and two suspensions in less than eleven months. In addition to the warning letters, Crawford's work file con-

the practice was prevalent at the time of Crawford's testimony in Dallas.

4. See part III C of this opinion, infra.

5. "Warning letters" are written notices which are given to an employee by Roadway when that employee is in some way deficient in his job performance or conduct.

tains a number of minute-by-minute surveillance reports made by Roadway supervisors, whereas no such reports appear in the file for any time prior to Crawford's appearance in Dallas. Such intensive surveillance could be expected to reveal faults in Crawford's work performance, so that some of the warnings given Crawford were probably justified. The surveillance itself, however, was unjustified, and is found to have been retaliatory.

2. Crawford and several other witnesses established that Crawford was often harassed in conjunction with restroom breaks. On more than one occasion, Crawford was told he could not go to the restroom or to get a drink of water on company time. Phillip Roos, a Roadway supervisor, once followed Crawford into the restroom, looked under the door of a stall and actually ordered Crawford off the toilet. Roadway witnesses claimed that restroom breaks are often abused by lazy workers, who must be ordered back to work. Nevertheless, there is a difference between management personnel checking the restrooms occasionally to see if anyone is openly wasting time, and invading the privacy of the stalls. The latter activity goes beyond supervision, and is found in this case to constitute harassment.

3. The evidence shows that on at least one occasion Crawford was not told of an emergency phone call from his wife. Mrs. Crawford called to inform Crawford that their daughter had run away from home or was missing, but Roadway officials did not call Crawford to the phone. Roadway witnesses attempted to explain away this incident by claiming that an error was made and that Crawford received apologies. This explanation, however, is not found to be credible considering the other treatment accorded Crawford at the time.

4. One of the loading doors at the dock, the 38 door, is situated directly opposite the desk of the breakout foreman. Both sides testified that problem employees are sometimes given work assignments at this door so the foreman can keep an eye on them. Crawford, however, was placed at the door for two to three months *consecutively*. Though Roadway witnesses alleged that Crawford was a poor employee who was in need of constant supervision, there is no evidence that any other problem employee was placed in such a situation for that length of time. Notably, Crawford was never placed under such extended supervision before giving testimony in Dallas. The length of this supervision is found to be out of the ordinary and is attributed to a spirit of retaliation.

5. At one point while Crawford was working as a fork lift driver, he was denied access to a fork lift and ordered to make a pre-dawn city delivery to Western Electric. Crawford cites this as another example of harassment in light of his seniority and the fact that there were junior men on the fork lifts at that time who could have made the delivery. Upon making these objections and refusing to make the delivery, Crawford was disciplined. Roadway denied that the junior men were qualified to make the delivery, and contended that by sending Crawford they would have been able to break only one job classification rather than two. However, Mike Jackson testified that at the time of this incident, he, Jackson, was qualified to drive into the city and was an unassigned employee. Thus, by sending Jackson, whose job as an unassigned worker was to fill in wherever needed, Roadway could have avoided breaking *any* job classifications and could have respected Crawford's seniority privileges. Under the circumstances, Roadway's actions are found to have been retaliatory. The same thing happened the following day, and when Crawford again refused to make the delivery, he was suspended.

6. Crawford once received a warning letter for driving a fork lift too slowly. He objected, contending that the fork lift and several others like it were not in proper working order and had to be driven slowly for safety. Roadway witnesses testified that the fork lifts worked properly, and claimed to have felt at the time that Crawford was wasting time and avoiding work by moving so slowly. The problem with Roadway's explanation is that the testimo-

ny of several other dock employees substantiates Crawford's allegation that the fork lifts were dangerous.

7. Given the extent of management's intensive surveillance of Crawford's work, his plight when working as a dock checker becomes clear. If Crawford carefully counted or recounted freight at a speed which management considered too slow, he would get a warning letter for failure to give a fair day's work for a fair day's pay, as happened on September 6, 1977. If, however, Crawford were to speed up his counting and checking in response to such a letter and make a mistake, he stood to receive a letter for negligence in his job function.

In summary, the evidence shows that Crawford's identity as an EEOC "informant" was known to Roadway management almost immediately after his return from Dallas. Management then began, as one witness put it, "bird-dogging" Crawford, through intensive surveillance, verbal abuse and warnings, questionable disciplinary letters, and unreasonable orders from supervisors. This unpleasant work situation led to an extreme nervous condition which, as will be discussed later, resulted in irritable bowel syndrome, various mental disturbances, hospitalization and family problems.

## II. CONCLUSIONS OF LAW

This court has jurisdiction over the parties and subject matter of this action under Title VII, as amended, 42 U.S.C. § 2000e, *et seq.*; 42 U.S.C. § 1981; and 28 U.S.C. §§ 1343 and 1345.

Defendant Roadway is an employer within the meaning of 42 U.S.C. § 2000e(b). All of the statutory prerequisites to suit have been fulfilled by the plaintiff.

### A. THE TITLE VII ACTION

#### 1. THE STATUTORY PROHIBITION AGAINST RETALIATION

Section 704(a) of Title VII, 42 U.S.C. § 2000e–3(a) provides that it is an unlawful employment practice for

an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this [title], or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this [title].

This statute offers protection under two different clauses known as the "opposition" and "participation" clauses. B. L. Schlei & P. Grossman, *Employment Discrimination Law*, 416 (1976). The court is concerned here with the participation clause, which protects an employee from retaliation by an employer for the employee's participation in an EEOC investigation.[6]

The employee is protected under this clause regardless of whether the charge filed with the EEOC is meritorious. *Pettway v. American Cast Iron Pipe Co.*, 411 F.2d 998 (5th Cir. 1969); *see Bradford v. Sloan Paper Co.*, 383 F.Supp. 1157 (N.D.Ala. 1974). In this case, the egregious "niggers and rosebushes" situation has been discussed. In addition, there was testimony that Cavanaugh Freight Company had been purchased by Roadway to obtain Cavanaugh's city routes. Jimmy Jackson, a Roadway dock worker, testified that a Roadway supervisor ordered him to "burn out" a black Cavanaugh employee. When the court asked Mr. Jackson what happened to the Cavanaugh employee, Mr. Jackson replied quite succinctly, "He quit." Against this background, the court can easily find it reasonable that Crawford perceived racial discrimination on the job, though a finding of racial discrimination is unnecessary.

#### 2. BURDEN OF PROOF

In order to prevail upon a claim of unlawful retaliation under § 704(a), the plaintiff must initially establish a *prima facie* case. *McDonnell Douglas Corp. v.*

---

**6.** Crawford filed a charge of retaliation with the EEOC as a prerequisite to the filing of this suit. However, the retaliation in this case occurred in response to this testimony at the Dallas hearing, not in response to the filing of the charge.

*Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). To establish a *prima facie* case of retaliation under the participation clause, the plaintiff must prove (1) that he participated in a Title VII proceeding, and his participation was known to the retaliator; (2) that he suffered adverse employment treatment during or after the participation; and (3) a causal connection between the adverse employment treatment and the participation. *Slotkin v. Human Development Corp.,* 454 F.Supp. 250 (E.D. Mo.1978); *see also EEOC v. Locals 14 & 15, Int. Union of Oper. Eng.,* 438 F.Supp. 836 (S.D.N.Y.1977).

■ In addition, in all Title VII cases where the plaintiff alleges disparate treatment, he has the burden of proving discriminatory motive on the part of the defendant. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 336 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977); *Burdine v. Texas Department of Community Affairs,* 608 F.2d 563, 566 (5th Cir. 1979). A charge of retaliation necessarily involves intentional conduct by the retaliator.

■ The court finds that Crawford adequately established a *prima facie* case. There is no dispute that Crawford gave testimony at the EEOC hearing in Dallas on March 1, 1977. The court has found as a matter of fact that this participation was known to Roadway almost immediately. The harassment and surveillance previously discussed occurred after Crawford's testimony in Dallas. Finally, Crawford's work record for the period prior to and following his EEOC testimony and the evidence presented at trial establishes that Crawford's harassment was caused by his EEOC participation.

■ The court also finds discriminatory motive in this case. Though Roadway witnesses had no problem in naming other employees who were allegedly as poor workers as Crawford, no evidence was submitted to show that those other employees were subjected, for example, to the same intensive surveillance. In fact, Crawford himself was never subjected to such treatment prior to the Dallas hearing. Roadway's denials are not found credible, and this court finds that Roadway's mistreatment of Crawford was deliberate.

### 3. THE EMPLOYER'S REBUTTAL

■ Once the plaintiff establishes a *prima facie* case, the defendant may rebut that showing by articulating a legitimate, non-discriminatory reason for its actions. *McDonnell Douglas, supra; Furnco Construction Co. v. Waters,* 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978); *Board of Trustees v. Sweeney,* 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978); *Burdine, supra* at 567. In this case, Roadway presented evidence that Crawford is a bad employee who requires an inordinate amount of supervision. Roadway contends that the surveillance and the warnings were therefore justified. In regard to the other alleged harassment, such as the restroom incident and the verbal abuse on the dock, Roadway flatly denied that the incidents took place. Consequently, Roadway successfully rebutted Crawford's *prima facie* case by articulating a legitimate non-discriminatory reason for Crawford's alleged disparate treatment.

### 4. PLAINTIFF'S RESPONSE

■ In order to prevail in this case, Crawford must then show that Roadway's articulated reason is a mere pretext for actual retaliatory conduct. *McDonnell Douglas, supra,* 411 U.S. at 804, 93 S.Ct. at 1825. The court finds that the evidence presented by Crawford is sufficient to show that Roadway's excuse for its conduct is pretextual. At trial, it was established that Crawford received an extraordinary amount of supervision and discipline after the Dallas hearing. Although Crawford may not be an ideal employee, he is not such a poor worker that minute-to-minute surveillance is necessary, and his record shows that no such surveillance was deemed necessary before the Dallas hearing.

■ Roadway's naked denials of any wrongdoing, asserted through the testimo-

ny of its management, presents a credibility issue which this court has resolved against Roadway. The evidence clearly establishes that Crawford was subject to calculated and blatant retaliation in direct violation of Title VII. The fact that Crawford is not a model employee did not entitle Roadway to use that situation as a facade for retaliatory supervision and discipline following the Dallas hearing, and such action cannot be countenanced.

For these reasons, the court finds in favor of Crawford on his Title VII cause of action.

## B. THE § 1981 ACTION

42 U.S.C. § 1981 provides in plain language:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

Roadway claimed that Crawford lacks standing to bring a § 1981 action in this case because he is white. However, in *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976), the Supreme Court stated as follows:

This cumulative evidence of congressional intent makes clear, we think, that the 1866 statute, designed to protect the "same right . . . to make and enforce contracts" of "citizens of every race and color" was not . . . intended . . . [for] the protection solely of nonwhites. Rather, the Act was meant, by its broad terms, to proscribe discrimination in the making or enforcement of contracts against, or in favor of, any race.

427 U.S. at 295, 96 S.Ct. at 2586.

The Supreme Court has also held that § 1981 affords a federal remedy against discrimination on the basis of race in pri-

vate employment contracts, *Johnson v. Railway Express Agency*, 421 U.S. 454, 459–460, 95 S.Ct. 1716, 1719–20, 44 L.Ed.2d 295 (1975), and that purely private acts of discrimination are covered by § 1981. *Jones v. Alfred Mayer Co.*, 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968).

In *DeMatteis v. Eastman Kodak*, 511 F.2d 306 (2d Cir. 1975), the Second Circuit reversed the district court, which had held that a white person does not have standing to sue under § 1981.

The Supreme Court has held . . . in *Sullivan v. Little Hunting Park*, 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 . . . that a white person who has been '. . . punished for trying to vindicate the rights of [non-white] minorities . . .' has standing to sue under § 1981.

511 F.2d at 312.

As evidenced by the findings of fact, the court concludes that defendant Roadway discriminated against Crawford by retaliating against him for trying to vindicate the rights of his fellow nonwhite employees. Accordingly, Crawford has proven his claim to relief under 42 U.S.C. § 1981.

## C. THE PENDENT CLAIM

Plaintiff also sought to pend a state tort claim for intentional infliction of emotional distress under Article 2315 of the Louisiana Civil Code. However, as the Supreme Court declared in *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), "Pendent jurisdiction is a doctrine of discretion, not of plaintiff's right." Since plaintiff is completely clothed in remedies under Title VII and § 1981, the court considers it proper to exercise this discretion and refuse to address plaintiff's pendent state claim. This claim is dismissed, and the court thus avoids a needless decision of state law. *See generally* 13 Wright & Miller & Cooper, *Federal Practice and Procedure—Civil* § 3567.

## III. DAMAGES

The court must now render an appropriate award for the damages suffered by Crawford as a result of Roadway's retaliation. The record shows these damages to be substantial. Not only did Crawford lose a significant amount of wages, holiday pay, vacation pay and sick pay, he also suffered demonstrable mental anguish manifested through irritable bowel syndrome, an extremely painful disorder. Crawford's doctors testified, and the court finds as a matter of fact, that these damages were directly caused by Crawford's reaction to his work situation, which was made intolerable by Roadway's retaliation. The court will consider each item of damages separately.

### A. BACK PAY

 Back pay is expressly authorized as an item of damages by Section 706(g) of Title VII, 42 U.S.C. § 2000e-5(g), where the court finds "that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint." Back pay is also available as an element of recovery under § 1981. *Johnson v. Railway Express Agency*, 421 U.S. 454, 460, 95 S.Ct. 1716, 1720, 44 L.Ed.2d 295 (1975).

The landmark case discussing the right of a victim of discrimination to back pay is *Albemarle Paper Company v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), in which the Supreme Court discussed the availability of back pay in terms of furthering the primary objective of Title VII. Quoting *Griggs v. Duke Power Company*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158, the court noted that the primary objective of Title VII was a prophylactic one:

"[The purpose of Title VII] was to achieve equality of employment opportunities and remove barriers that have op-

erated in the past to favor an identifiable group of white employees over other employees." [401 U.S. at 429–30, 91 S.Ct. at 852–53.] Backpay has an obvious connection with this purpose. If employers faced only the prospect of injunctive order, they would have little incentive to shun practices of dubious legality. It is the reasonably certain prospect of a backpay award that "provide[s] the spur or catalyst which causes employers and unions to self-examine and to self-evaluate their employment practices and to endeavor to eliminate, so far as possible, the last vestiges of an unfortunate and ignominious page in this country's history." . . . It is also the purpose of Title VII to make persons whole for injuries suffered on account of unlawful employment discrimination.

422 U.S. at 417–18, 95 S.Ct. at 2371 (citations omitted).

 In order to make Crawford whole, this court is required to make an award of back pay which may be justified by the evidence.[7] The Court of Appeals for the Fifth Circuit has noted that:

[I]n computing a back pay award two principles are lucid: (1) unrealistic exactitude is not required, (2) uncertainties in determining what an employee would have earned but for the discrimination, should be resolved against the discriminating employer.

*Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211, 260–61 (5th Cir. 1974) (footnotes and citation omitted). A back pay award should always include "straight pay", *i. e.*, actual salary lost because of work time missed. *See Pettway, supra.* In addition, the award should recognize lost fringe benefits where applicable, including vacation pay, holiday pay and sick pay. *Pettway, supra* at 263; *Schattman v. Texas Employ-*

---

7. There are no problems with prescription or laches in regard to the back pay period at issue in this case, since the statute provides that "back pay liability shall not accrue from a date more than two years prior to the filing of a charge with the Commission". Here, Crawford does not contend that he is entitled to any back pay in excess of two years prior to his filing of

the charge with the Commission. Though the applicable prescriptive period under § 1981 is governed by state law and is thus a shorter one-year period, *see Johnson v. Railway Express Agency, Inc., supra*, Crawford is adequately clothed with the back pay remedy under § 2000e–5(g).

*ment Commission*, 330 F.Supp. 328 (W.D. Tex.1971), *rev'd on other grounds*, 459 F.2d 32 (5th Cir. 1972), *cert. denied*, 409 U.S. 1107, 93 S.Ct. 901, 34 L.Ed.2d 688 (1973).

In determining what Crawford would have earned but for Roadway's retaliation, there is some uncertainty. Crawford's only evidence of his lost work hours [8] is Plaintiff's Exhibit No. P–8, an unsubstantiated self-serving document handwritten by Crawford. P–8 was introduced into the record in order to save time, on a joint stipulation that Crawford's testimony would impart the same information as that contained in P–8.

Roadway argues that much of the time Crawford allegedly lost due to harassment is shown by his time cards [9] actually to have been spent on personal business, sick leave, or vacation. In his post-trial rebuttal memorandum, Crawford points out that he had no control over the entries made on his time cards by Roadway supervisors. Thus, for example, if Crawford had to escape from the harassment by leaving work early, management could simply mark his time card "sick". To this extent, the time cards are also somewhat self-serving. Roadway management could not be expected to mark Crawford's time cards "absent because of harassment" in appropriate situations.

■ The conflict presented by these two exhibits, P–8 and D–14A, must be resolved for the court to determine an appropriate back pay award. From the finite total number of work hours which Crawford missed during the period at issue, the court must derive the number missed by Crawford *due to retaliation.* In making this determination, the uncertainties are to be resolved in Crawford's favor. As set out in the following tables, the court finds that the stated work hours are compensable. In reaching these findings, the court compared P–8 with Crawford's time cards and found compensable the hours which appeared due

to harassment. All other hours are found to be legitimate leave time, not caused by Roadway's retaliation.

(1) From April 1, 1977 to March 31, 1978, Crawford's wage: $8.52/hr.

Lost Hours:

| | |
|---|---|
| 9/21/77 | 3.5 hrs. |
| 9/23/77 | 1.5 hrs. |
| 9/28/77 | 5.58 hrs. |
| 11/1/77 | 3.36 hrs. |
| 3/3/78 | 8.00 hrs. |
| | 21.94 hrs. at $8.52/hr. = $186.93 |

(2) From April 1, 1978 to March 31, 1979, Crawford's wage: $9.40/hr.

Lost Hours:

| | |
|---|---|
| 4/5/78—4/22/78 | 111.00 hrs. |
| 4/25/78—5/6/78 | 80.00 hrs. |
| 8/5/78 | 3.3 hrs. |
| 9/5/78—9/9/78 | 40.00 hrs. |
| 9/13/78—3/30/78 | 1144.00 hrs. |
| | 1378.30 hrs. at $9.40/hr = $12,956.02 |

(3) From April 1, 1979 to April 23, 1979, Crawford's wage: $10.20/hr.

Lost Hours:

| | | |
|---|---|---|
| 4/2/79—4/23/79 | 128 | hrs. |
| (less 56 strike | | |
| hours) | 56 | hrs. |
| | 72 | hrs. at $10.20/hr. = $734.40 |

(4) Holiday Pay:

| | | |
|---|---|---|
| Thanksgiving 1978 | 16 | hrs. at $9.40/hr. |
| Christmas 1978 | 24 | hrs. at $9.40/hr. |
| New Year's 1979 | 16 | hrs. at $9.40/hr. |
| Easter 1979 | 16 | hrs. at $10.20/hr |

Total Holiday Pay = $689.60

(5) Vacation Pay:

| | | |
|---|---|---|
| 1978 (two weeks) | 90 | hrs. at $9.40/hr. |
| 1979 (three weeks) | 135 | hrs. at $10.20/hr. |

Total Vacation Pay = $2,223.00

(6) Sick Pay:

| | | |
|---|---|---|
| 4/7, 4/8, and 4/11/78 | 24 | hrs. at $9.40/hr. |

Total Sick Pay = $225.60

The court therefore calculates Crawford's total lost wages by adding the six elements as follows:

| | |
|---|---|
| (1) Straight pay, 4/1/77—3/31/78 | $186.93 |
| (2) Straight pay, 4/1/78—3/31/79 | $12,956.02 |
| (3) Straight pay, 4/1/79—4/23/79 | $734.40 |
| (4) Holiday Pay | $689.60 |
| (5) Vacation Pay | $2,223.00 |
| (6) Sick Pay | $225.60 |
| Total Back Pay: | $17,015.55 |

---

8. To determine lost wages in this case, the court need only determine the number of hours lost by Crawford as a result of Roadway's retaliation, since Crawford's hourly wages were set by union contract.

9. Defendant's Exhibit D–14A.

## B. PREJUDGMENT INTEREST ON BACK PAY

In order to make the injured party whole, prejudgment interest should be assessed on back pay awards. This ruling recognizes the basic economic concept of the time value of money, and the assessment is not prohibited by the federal interest statute, 28 U.S.C. § 1961. *Illinois Central R. R. Co. v. Texas Eastern Transmission Co.*, 551 F.2d 943, 944 (5th Cir. 1977). Accordingly, the court awards interest from the respective date of each instance of lost wages, beginning September 27, 1977, until paid, at a rate of seven per cent (7%) per annum.

## C. COMPENSATORY DAMAGES

The testimony of Dr. A. R. Ebrahim and Dr. James H. Phillips established that Crawford suffered irritable bowel syndrome, anxiety and depression as a result of his strained work situation. Dr. Phillips, a psychiatrist, testified that Crawford's response to his work environment was typical of a disorder known as adult situational reaction, in which an otherwise-normal adult can experience mental difficulties as a result of an inability to deal with a troublesome situation. In Crawford's case, his reaction to his work environment produced mental anxiety and nervousness which manifested themselves in the gastrointestinal problem.

Crawford was hospitalized twice for treatment of the bowel disorder. From September 10 to October 20, 1978, Crawford was treated in a mental institution. After his release from the mental hospital, Crawford remained under Dr. Phillips' care until April 23, 1979.[10]

The testimony of several of Crawford's fellow employees established that Crawford exhibited a serious personality change during this time, from a happy-go-lucky type to an extremely nervous, almost paranoid type. This personality change caused serious family problems as well. Mrs. Crawford testified that Crawford, in an almost "Jekyll-Hyde" transformation, went from a good husband and father to a moody, short-tempered introvert.

For these problems, Crawford is entitled to compensatory damages, including damages for physical pain and suffering and emotional distress, under § 1981. *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 240, 90 S.Ct. 400, 406, 24 L.Ed.2d 386 (1969); *Claiborne v. Illinois Central R. R.*, 583 F.2d 143 (5th Cir. 1978). In their post-trial briefs, the parties cite many cases indicating that the compensatory damage figure in this case should be low or high, depending on their respective interests. However, the court does not find those cases illuminating. Compensatory damage awards are subject to the peculiar factual circumstances surrounding each individual case.

In this case, the court has heard all of the live testimony and has reviewed the exhibits. The physical pain suffered by Kenny Crawford from irritable bowel syndrome was serious indeed. The mental distress, as evidenced by its physical manifestations and Crawford's personality change, is equally serious. These damages cannot be quantified precisely, but the court finds that an award of $17,000 for compensatory damages is justified under these circumstances.

## D. MEDICAL DAMAGES AND THE COLLATERAL SOURCE ISSUE

In *Haughton v. Blackships, Inc.*, 462 F.2d 788 (5th Cir. 1972), the Fifth Circuit discussed the collateral source rule as follows:

In considering the applicability of the collateral source rule, the basic principle to be applied is that the employer-tortfeasor

---

**10.** There is some dispute as to when Dr. Phillips released Crawford to return to work. Roadway puts the date at February 13, 1979, when Dr. Phillips informed Roadway that Crawford was ready to return to a "normal work environment". The court agrees with Crawford that, at least for him, Roadway did not provide a "normal work environment" at the time. Thus, the court concludes that April 23, 1979, the date Crawford was finally released from Dr. Phillips' care, is the effective date of Crawford's release to return to work.

is not entitled to mitigate damages by setting off compensation received by the employee from an independent source. However, it is also true that the source of the funds may be determined to be collateral or independent, even though the employer-tortfeasor supplies such funds . . . . The mere fact that the employer-tortfeasor has contributed money (by payment of premiums, contributions, etc.) to the fund from which the benefits derive does not establish that such fund may not be a collateral source . . . .

462 F.2d at 790.

Applying these considerations to this case, the court ruled at trial that any medical compensation received by Crawford from the union medical benefits plan could not be used by Roadway as a set-off against Crawford's medical expenses. The court reasoned that, although the plan is funded by the "employer-tortfeasor" (Roadway), it is in essence "a fringe benefit maintained by the employer and is in effect part of the employee's income for services rendered . . . ." *Hall v. Minnesota Transfer Ry. Co.*, 322 F.Supp. 92, 97 (D.Minn.1971), *quoted in Haughton, supra*, 462 F.2d at 791. Thus, the medical compensation received by Crawford came from an independent, collateral source and the employer is not entitled to a set-off.

The court awards the following medical expenses, as substantiated by Plaintiff's Exhibits P–5(A) through P–5(D):

| | |
|---|---|
| Doctor's Hospital (4/4/78—4/23/78) | $2,100.75 |
| Doctor's Hospital (9/4/78—9/10/78) | $ 788.75 |
| Brentwood Hospital (9/18/78—10/20/78) | $3,545.70 |
| Dr. Sanders | $ 30.00 |
| Dr. Ebrahim | $1,036.00 |
| Dr. Phillips | $1,488.42 |
| Mr. Gucker | $ 637.50 |
| Medicine | $ 166.64 |
| TOTAL MEDICAL DAMAGES: | $9,793.76 |

### E. ATTORNEYS' FEES

Crawford is entitled to attorneys' fees under 42 U.S.C. § 1988 and Title VII. *Christianburg Garment Co. v. EEOC*, 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978); *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974). The plaintiff's attorneys are ordered to submit their hourly records so that the court can make an appropriate determination of reasonable fees under the factors set out in *Johnson, supra.*

### IV. CONCLUSION

Plaintiff is hereby ordered to submit a judgment conforming to this opinion within five (5) days of this date. All costs are to be borne by defendant Roadway Express. The court will rule upon the request for attorney's fees as a separate matter, after a hearing if one is deemed necessary.