**Terry MARSH, Plaintiff,**

v.

**DIGITAL EQUIPMENT CORPORATION, a Massachusetts corporation.**

**Civ. No. 84–1167 PHX CLH.**

United States District Court, D. Arizona.

Aug. 13, 1987.

1187

Richard S. Cohen, Phoenix, Ariz., for plaintiff.

Ruth V. McGregor, Phoenix, Ariz., for defendant.

MEMORANDUM OPINION
AND ORDER

HARDY, District Judge.

The plaintiff, Terry Marsh ("Marsh"), brought this action against the defendant Digital Equipment Corporation ("Digital") to recover damages for racial discrimination in violation of 42 U.S.C. § 1981 and breach of implied contract. This Court has jurisdiction under 28 U.S.C. § 1343 and the doctrine of pendent jurisdiction.

Trial of the case has been to the Court. This memorandum shall constitute the Court's findings of fact and conclusions of law required by Rule 54 of the Federal Rules of Civil Procedure. Judgment will be ordered in favor of Marsh on the racial discrimination claim and in favor of Digital on the breach of implied contract claim.

FACTUAL BACKGROUND

Digital is a Massachusetts corporation that manufactures computer hardware and software in plants in Arizona, other states, and foreign countries.

Digital provides all of its employees with an orientation handbook entitled "Digital and You." The handbook informs employees that "Digital has designed some procedures to protect both you and other Digital Employees." Two of those procedures are:

1. Corrective action.

Digital maintains a Corrective Action and Discipline procedure designed to be both fair and impartial when an employee is experiencing performance problems. Based on the premise that corrective action and discipline should be positive, this procedure is intended to prevent terminations whenever possible.

The Corrective Action and Discipline procedure involves the following steps:

1. Problem Solving Session

A supervisor meets with an employee to identify and discuss problem areas and actions that must be taken by the employee to correct these problems.

2. Verbal Warning

If problem areas do not improve, a more direct approach is necessary. The supervisor should verbally warn the employee, stating that if performance is not corrected within a reasonable amount of time, further disciplinary action will be taken.

3. Written Warning

After the verbal warning, if improvement does not occur within a reasonable amount of time, the employee is given a written warning. This written warning clearly identifies the problem and indicates that, if improvement is not forthcoming, the employee will be terminated from the company.

4. Discharge

If, after a reasonable period of time, the employee's performance does not improve, the employee will be terminated from the company.

2. Employee Conduct

In general employees can anticipate that actions harmful to another employee or to the company are cause for disciplinary procedures or possible dismissal. Specifically, employees are expected to be at their work sites and attend to their responsibilities.

Employees are expected to respect the individual rights and privacy of others. For example, they will not:

Discriminate on the basis of race, sex, age, religion or ethnic background.

\*      \*      \*      \*      \*      \*

Behave in a manner offensive to others.

The handbook also informs employees that "It is our responsibility to insure that all employees and potential employees be evaluated on the basis of qualifications and ability, without regard to ... sex, race, color...." and that Digital wants "not only to be technically honest, but also to make sure that the implication of what we say and the impressions we leave are correct. When we make a commitment to customers or to employees, we feel the obligation to see that it happens."

Digital provides all of its supervisors with a manual entitled "Personnel Policies and Procedures," which is revised from time to time. Section 6.01 of the manual sets forth policies and procedures relating to the termination of employees. Four

types of termination are defined. One, "Company Discharge," is a termination when an employee violates a work rule or is guilty of serious misconduct (including any illegal acts) and when immediate termination from the company is deemed appropriate.

In July 1982, Digital published Section 6.03 of the manual, "Harassment Policy." Harassment is defined as "behavior which is personally offensive, impairs morale and interferes with the work effectiveness of employees." The manual states that "Sexual harassment includes unwelcomed sexual advances, requests for sexual favors, and other verbal or physical conduct that is both sexual and offensive in nature. Managers and supervisors are expected "to halt any harassment of which they become aware by restating the Company Policy and, when necessary, by more direct disciplinary action." In determining whether conduct is sexual harassment, they are instructed that "the nature of the sexual advances and the context in which they supposedly occurred must be examined."

Section 6.21 of the manual sets out the same corrective action and discipline procedure that was contained in "Digital and You." However, supervisors were told: "You may need to skip one or more steps in certain situations. For example, if an employee violates a major work rule, (as contained in the You and Digital Employee Handbook) he or she would be given a written warning or discharged, depending on the severity of the situation." If corrective action consists of a problem solving session, the supervisor is instructed to "document, for his or her own records, when the meeting was held and any conclusions that were reached at the meeting."

Section 6.24 of the manual sets forth unacceptable employee conduct. "In general, employees can anticipate that actions harmful to another employee or to the company are cause for disciplinary procedures or possible dismissal." Employees are not to "discriminate on the basis of race, sex, age, religion or ethnic background," nor to "behave in a manner offensive to others."

Section 6.02 of the manual announces an open door policy. If an employee has a problem that is not resolved by discussion with the employee's supervisor or manager, the employee "should talk to your Personnel Representative." If the employee is still not satisfied, he or she "may go to any other appropriate person in the Company," which "usually but not necessarily, means going to the next highest level of management in your organization."

Digital has no policies regarding social activities of its employees. Supervisors can, and do, socialize with subordinates. A consensual liason of supervisor and subordinate would not be a violation of Digital policy.

Section 6.21 also contains an appeal process: "Supervisors are responsible for assuring that their employees are aware that they can appeal disciplinary action at any step. Employees should feel free to speak to their Personnel Representative or to any level of Management in their appeal in accordance with the company's Open Door Policy."

Marsh is a black male. He went to work for Digital in Massachusetts on October 2, 1972. After about two years, he was promoted to production supervisor. In 1979 he transferred to Digital's Phoenix plant, where he was a production supervisor in the final test and assembly area. Marsh's job performance was evaluated periodically by his superiors. On the basis of the evaluations he received merit salary increases for the years ending October 1978, 1979 and 1980. His job evaluation for the year ending October 1981 was "requires development" and no merit salary increase was recommended. However, in January of 1982 he was given a 5% merit salary increase. Many of the people who worked under Marsh respected him as a supervisor.

In addition to its permanent employees, Digital hires temporary employees, who are known as contract employees, during peak periods. When vacancies occur, contract employees may be considered for permanent positions and will be interviewed by a production supervisor whose group has a vacancy.

When overtime work is required, the production supervisor is empowered to offer the overtime work to permanent and contract employees who are not in his group.

Marsh was a "toucher." When he talked to a person, whether a man or a woman, he tended to put a hand on the person's shoulder or arm or back. Until June 16, 1983, no woman employed by Digital had ever complained because Marsh had touched her, nor was there ever any complaint of any other conduct by Marsh that could be considered sexual harassment. However, two occurrences before that date were later relied on by Digital to support its claim that Marsh had been terminated for sexual harassment.

Sometime in 1979, Cora Stapp observed an employee, Midge Porter ("Porter"), crying at her work bench. Stapp had Porter come into her office so that they could talk. Porter stated that she had been giving Marsh rides home, that she had become very fond of him and that she had wanted more of a relationship with him. She declined to give Stapp permission to discuss the matter with Marsh. Stapp kept no notes of this interview.

In 1980 Janette Dennison ("Dennison") was a Digital employee at the Phoenix plant. Marsh was not her supervisor, but from time to time he offered her overtime work. They were friends who often attended the same social activities. Dennison separated from her husband and moved into an apartment near the apartment complex where Marsh lived. When he learned that she was living nearby, he began coming to her apartment to see her. Dennison is white, and she felt awkward about a black man coming alone to her apartment. She was fearful of asking Marsh not to come to her apartment, because she was afraid that he would no longer ask her to work overtime.

Dennison discussed her concerns with her supervisor, George Stout. At that time, in September of 1980, Stout and Marsh were supervisors at the same level. Later, Stout was promoted to senior supervisor and for a short period of time supervised Marsh. Stout told Dennison to discuss her concerns with Marsh. He also approached Marsh as a friend to tell him of Dennison's concerns, and he advised Marsh to avoid seeing Dennison. Stout did not prepare a memorandum of his conversation with Marsh.

Dennison followed Stout's advice, and talked to Marsh about her concerns. He agreed that he would not do anything further to cause her any problem.

Cora Stapp, a black woman who was Marsh's production manager, learned of the Dennison matter from either Stout or Ron White, another production supervisor. She talked to Marsh and told him that Dennison had complained about his coming unannounced to her apartment. Marsh assured Stapp that he did not make a habit of going over to see her and that there would not be any problem. Marsh wrote a memorandum to Cora Stapp, dated September 24, 1980, "to document this info & the events surrounding Janette." Stapp wrote a memorandum dated September 29, 1980, memorializing her conversation with Marsh: "I had a discussion with Terry today concerning his relationship with female employees. He denied it and said that he would watch it. The conversation generated from situation with Jeanette."

On June 15, 1983, Carol Benson ("Benson") and Kacey Dee Miller ("Miller"), both temporary employees, complained to their supervisor, Charles Conway, about Marsh's conduct toward them. The following day four more women complained. Conway informed his immediate superior, James DeBlasio, of the women's complaints. DeBlasio informed Conway that he would handle the matter and he interviewed five of the six women individually. The sixth woman was interviewed by Larry Stapp, DeBlasio's immediate superior.

Miller informed DeBlasio that she had heard on the production line that one should "watch out for Terry," that the first time she ever saw him he was staring at her, that he once touched her shoulder and her arm and asked her what she was doing, that he once approached her and asked "What's happening here" while staring at her breasts. She also once saw Marsh

touch another woman on the shoulder and neck and a third woman on the wrist.

Miller had once had an encounter with Marsh in which she referred to him as "Nigger." She also once told Yolanda Tagge that Marsh was "too big for his britches" and that "she would like to take him down a notch."

Benson did not work under Marsh's supervision, but she lived near him. She complained that about two weeks after she started working for Digital, Marsh told her one night that he needed a ride home, and she gave him a ride; that the second time she gave him a ride he patted her arm and leg in a gesture of thanks; that at the end of the third ride he kissed her on the cheek; that the last time she gave him a ride he pulled her head toward him and kissed her on the lips; and that on several occasions Marsh telephoned her after she got home from work or during the day. On at least one occasion Benson accepted Marsh's invitation to come to his apartment for coffee and stayed there for an hour or more, during which time she confided to him some of her personal problems.

Benson was upset by Marsh's actions and wrote him a letter trying to explain how she felt. She handed the letter to Marsh at the Digital plant. He never bothered her again.

Joy Robinson told DeBlasio that when Marsh interviewed her for a permanent position, his first question was whether she was married; that during the interview she mentioned that she was going to have to move; that Marsh suggested to Robinson that she look at the apartments in his complex; that he insisted that she inform him when she would go there to look for an apartment; and that on a later occasion, Marsh asked Robinson if she lived alone.

Sally Rodriguez, a temporary employee, told DeBlasio that Marsh once touched her low on the chest from behind while she was working; that she thought it was an accident until it was repeated several days later; that Marsh followed her around and circled around her while she was working; and that he was always patting her on the

shoulder. She admitted that he had once criticized her work.

Enie Hamlin, a permanent employee, stated that Marsh once offered to help her prepare a resume and suggested that they work on it at Janette Dennison's apartment; and that a woman named Gloria once went to Las Vegas with Marsh and later "got ahead." DeBlasio discounted everything that she told him. She did not claim to have been sexually harassed.

Tagge, also a temporary employee, told Larry Stapp that about a week after she was given an application form to apply for a permanent position, Terry asked her a number of personal questions such as where she lived, whether she was married, whether she had children, whether she liked to party, and with whom she liked to party; that about a week later he asked her what she was doing that weekend; that when she told him that she was going to spend it in her backyard he suggested she tell him where she lived so that he could spend the weekend with her.

DeBlasio inquired of two of Marsh's previous supervisors to learn whether there had previously been charges of harassment. One of them, Stout, informed DeBlasio of the Dennison incident. At DeBlasio's request, Stout prepared a written report on the incident in which he stated that Dennison "was feeling 'unsafe.'"

Marsh did not work on June 16, 1983. When he came to work on the 17th, DeBlasio informed him of the complaints. DeBlasio informed him that several complaints of sexual harassment had been made against him, but he refused to tell Marsh who had made the complaints or to give him any details about the accusations except to state generally that Marsh had been accused of touching women in the work place. Marsh informed DeBlasio that he always touched both men and women in the work place but in a completely nonsexual manner. He also informed DeBlasio that he had recently been critical of the job performance of some temporary employees who had worked for him on an occasional basis. DeBlasio told Marsh that he was

being suspended pending the outcome of an investigation and sent him home.

DeBlasio also discussed what had happened with the plant's personnel manager, Erline Belton–Willis, a black woman. It was agreed that written statements should be obtained from the complaining women. One of them, Rodriguez, refused to give a statement.

Neither DeBlasio, Belton–Willis nor anyone else at the plant made any further investigation to attempt to corroborate or disprove any of the allegations against Marsh. None of the employees who worked in close proximity to any of the complaining women was interviewed in an effort to corroborate or disprove any of the complaints. With the exception of Hamlin, DeBlasio and Belton–Willis thought that the complaining witnesses were telling the truth.

Rumors about Marsh were flying around the plant. Employees had been informed that a temporary supervisor was taking over in his place. On June 23, 1982, ten of the employees who had been directly supervised by Marsh, all women, two of whom were temporary employees, spoke to DeBlasio in behalf of Marsh. According to DeBlasio's own notes of the interviews, the women told him that Marsh had never been improper or impolite, that he had never gotten out of line, and that he touched people but in a friendly way. One of the women told DeBlasio that she thought the complaints were racially motivated. That thought had crossed DeBlasio's mind. He was also concerned that some employees might have been out to get Marsh as retaliation. Nonetheless, he made no investigation to determine whether there was a racial motivation for the complaints.

On June 27, 1983, Marsh met again with DeBlasio, who told him that the investigation was continuing. However, DeBlasio again declined to give him any more specific information. He instructed Marsh to meet with Belton–Willis.

Marsh met with Belton–Willis on the same day. She, too, refused to give him the names of the women who had complained or to provide any specific informa-

tion. She asked him if there were any one he could think of who might make complaints against him and he was unable to do so. Marsh informed Belton–Willis, as he had informed DeBlasio, that he had long been in the habit of touching both male and female employees while talking to them.

One other person, Robin LeClair, a permanent Digital employee, talked to Belton–Willis and corroborated Benson's complaint. LeClair later provided a written statement.

After consulting with corporate headquarters, DeBlasio and Belton–Willis agreed that Marsh should be terminated. Larry Stapp concurred in this decision. On July 1, 1983, Marsh was informed by DeBlasio that his employment was being terminated. DeBlasio recorded on a Digital form that "Terry has on two occasions harassed subordinate female employees." Belton–Willis told him that he had the right to appeal to Les Goldman, the plant manager and that he should call Goldman's office for an appointment. Marsh did not do that, but he wrote a letter to Goldman.

When Marsh was discharged, neither DeBlasio nor Belton–Willis was aware that Cora Stapp had talked to Marsh in 1980 about Dennison.

Between 1981 and 1983 charges of sexual harassment were leveled against three white men at Digital's Phoenix plant. In December 1981 an evaluation was made of the job performance of Elaine Bruno ("Bruno"), a senior secretary. Bruno submitted comments on the evaluation in which she named Dave Boshes ("Boshes") as one of her supervisors. She listed a number of "major frustrations," including "being sexually intimadated (*sic*) by Dave Boshes, having to listen to his profane outbursts, and watching him play 'boss'." She was interviewed by DeBlasio and gave as an example of sexual intimidation that Boshes had asked her whether she "got laid over the weekend." She also told DeBlasio that she did not want to pursue the matter further, nor did she want any further occurrence. In an interview with Boshes, DeBlasio told him that Bruno had complained and told him what the complaints

were. No further action was taken against Boshes.

In 1983 Frank Brandeberry was accused of sexual harassment. The name of the complaining woman was given to him. He was given a strong verbal warning.

In September 1983 Graciela Gilmore ("Gilmore") complained that Lou Frederick ("Frederick") "placed his hand on my waist and proceeded to move it upward across my bust." When interviewed by Winona Sharp ("Sharp"), the supervisor of environmental administration at Digital's Phoenix plant, Gilmore gave the names of three other women who had complained of Frederick's conduct. Sharp requested each of the three women to state their complaints in a memorandum.

Bruno prepared her memorandum with "much apprehension due to the smeared reputation and harassment (*sic*) I received from Engineering Management two years ago after I filed a similar claim against Dave Boshes." She complained that on February 2, 1983, Frederick came over to where she was standing and held his arm and leg against her side until she moved away; that on March 8, 1983, when she met him while walking down an aisle, he threw his hip into her and bumped her against the wall; that on March 30 and April 13, he put his arm around her waist and proceeded to move his hand up her side; that on May 10, 1983, he pressed his side against hers, and that on July 19, 1983, as they were approaching each other in a hall and were about to pass, he jumped right in front of her so that she walked right into him. All of these incidents occurred at the work place.

Debbie Chavez complained that at a party on December 19, 1982, Frederick introduced her to his wife as his "sex-retary;" that on July 25, 1983, he asked her if he could help her untangle some bows on her blouse. She also complained that he "at times" put his arm around her shoulder and that he was always winking at her.

Nancy D. Wallace complained that in July 1982, shortly after she came to work for Digital, Frederick approached her one morning and asked her if she had been a good girl; that a couple of days later, he came into her office, approached her from behind, put his hands on her shoulders and squeezed them and again asked her if she was being a good girl. About a week later he asked her the same thing. During the second week of August he came into her office again, approached her from behind, put his hands on her shoulders, and asked her if she had been a good girl.

Frederick was interviewed by both Jim Davis, his supervisor, and Belton–Willis. Davis told Frederick the names of the women who had complained and informed him of the specific details of their complaints.

Belton–Willis talked to Frederick and Gilmore together. Davis and Belton–Willis believed him when he said he was not aware that his conduct could be regarded as sexual harassment. Belton–Willis concluded that Frederick had not deliberately done the things of which Gilmore complained.

About a year earlier, Frederick had been counseled by one of his superiors about his conduct towards women. While Davis' superior recommended a written warning, Davis gave him a verbal warning.

After he was discharged, Marsh applied for unemployment compensation benefits. Digital opposed his being granted those benefits. At two hearings before an Appeals Tribunal of the Arizona Department of Economic Security, Digital seriously misrepresented the facts relating to Marsh's discharge. At a hearing on October 25, 1984, Belton–Willis testified that "[t]here was a very intense investigation, because I wanted to make sure, as personnel manager, that he was not a victim. And so we spent about two weeks making sure that, in fact, those harassment charges were valid." This testimony was, to be charitable, incorrect. DeBlasio and Belton–Willis did not spend two weeks making sure that the charges against Marsh were valid. Indeed, they made no effort to determine the validity of the charges. They accepted the complaints of all the women, except one, as valid. Statements by Digital employees in support of Marsh, many of which flatly

contradicted what the complaining women had stated, were simply ignored.

Belton–Willis further testified that there were "two previous times when [Marsh] had been warned that behavior was not acceptable." Further, on the basis of someone else's documentation, "He had approached some other women. The pattern seemed to be that he would ask for telephone numbers or rides home, something of that nature that was offensive to people and there was some touching that was unwarranted, and not called for and the pattern has repeated itself over time. The first incident, I believe, was in '79, and the instances have such a similar pattern to them, even with this most recent charges that came forth. The same pattern exhibited itself. It had not changed. In fact, the behavior was the same as he had been warned to change or asked to change." The documentation mentioned by Belton–Willis consisted of the memorandum Stout wrote to DeBlasio in June 1983 and a memorandum dated July 21, 1983, written by Cora Stapp at the request of Sharp. Copies of the memoranda were offered in evidence at the Appeal Tribunal hearing. However, the copy of the Stout memorandum had been altered. As originally written to DeBlasio, Stout reported on an event that occurred "in the January 1980 time frame." The copy presented to the Appeals Tribunal had been altered to state that the event occurred "in the January '81 time frame."

Two copies of the Cora Stapp memorandum were presented as evidence to the Appeals Tribunal. The first referred to a 1979 incident. Cora Stapp testified that this date was incorrect and that everything had occurred in 1980.

Her memorandum referred to a disturbance "between two young ladies over their relationship with Terry." The young ladies were Dennison and Porter. There never was a disturbance. The memorandum went on to state that she asked Marsh "to discontinue the habit identified (touching, inviting himself to their apartments, car pooling, and asking for telephone numbers.)" Touching, car pooling, and asking

for telephone numbers have never been complaints raised by Dennison or Porter.

As a result of his discharge, Marsh suffered embarrassment, humiliation and anxiety. At the time of his discharge, Marsh's annual salary was $25,729.60. In addition he was paid an additional 10% as shift differential pay because he worked the second shift. He reasonably could have expected annual pay increases of not less than 5%.

In February 1984 he went to work for another company at a salary of $28,000 per year. However, there was no additional shift differential pay and he was required to work from 60 to 75 hours per week. He quit that job in May 1984 because of the long hours and because of a disagreement with a supervisor. He went to work for his present employer on August 20, 1984, at a salary of $24,600 per year. On March 15, 1985, his salary was raised to $27,000 per year and on August 12, 1986, it was raised to $29,184 per year. Marsh made a reasonable effort to mitigate his damages.

## DISCUSSION

### 1. *Racial discrimination*

Section 1981 of Title 42 of the United States Code affords a federal remedy against discrimination in private employment on the basis of race. *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 459, 95 S.Ct. 1716, 1719–20, 44 L.Ed.2d 295 (1975). In an employment discrimination action the plaintiff has the initial burden of proving a prima facie case of discrimination. *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

Once plaintiff has established a prima facie case of discrimination, the defendant may then articulate a legitimate non-discriminatory reason for the challenged action. The plaintiff then has the opportunity to prove by a preponderance of the evidence that the defendant's proffered reason is merely a pretext for discrimination. *Id.* at 804, 93 S.Ct. at 1825; *Texas Department of Community Affairs v.*

*Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981).

■ Section 1981 can only be violated by purposeful discrimination. *General Building Contractors Association v. Pennsylvania,* 458 U.S. 375, 391, 102 S.Ct. 3141, 3150, 73 L.Ed.2d 835 (1982).

■ In the racial discrimination context, plaintiff does not have to show that discrimination was the sole cause for discharge. "It is sufficient to show that discrimination made a difference between retention and discharge." *Mitchell v. Keith,* 752 F.2d 385, 391 (9th Cir.1985).

■ Proof of pretext may be made by showing that employees of another race involved in acts "of comparable seriousness" were disciplined less severely than plaintiff. *See e.g. McDonald v. Santa Fe Trail Transportation Company,* 427 U.S. 273, 282–83 and n. 11, 96 S.Ct. 2574, 2579–80 and n. 11, 49 L.Ed.2d 493 (1976); *Garrett v. City and County of San Francisco,* 818 F.2d 1515, 1519 (9th Cir.1987).

■ The preponderance of the evidence established that Digital intentionally discriminated against Marsh because of his race and that the discrimination made a difference between retention and discharge.

The conclusions are inescapable that had Benson not complained about Marsh, he would not have been discharged and that he was discharged because he is black. During the 11 years that he had been employed by Digital, no woman had ever complained of his conduct until June 1983. He was known to touch persons while talking to them, but no Digital superior had ever suggested that touching others was improper. Marsh acted improperly in placing his hand on Miller's shoulder and letting it run down her arm, in calling her "honey," in touching Rodriguez on her chest, and in asking Robinson in the course of an interview for a permanent job whether she was married. However, it is unlikely that these complaints collectively would have led to Marsh's discharge. It was Benson's complaint and Stout's report that three years earlier Marsh's conduct had made Dennison feel "unsafe" that caused DeBlasio to conclude that on two occasions Marsh had harassed subordinate employees and that the termination of Marsh's employment was required.

Two factors support the conclusion that Marsh was discharged because he was black. First, Digital dealt with complaints against white men differently than the complaints against Marsh. Boshes, Brandeberry and Frederick were all told who had complained against them, and Boshes and Frederick were told specifically what the complaints were. When Gilmore complained about Frederick's conduct and gave Sharp the names of three other women who had complained about his conduct, Sharp investigated to determine if the three women had complaints that would corroborate Gilmore's complaint. The conduct of Boshes and Frederick was considerably more explicitly suggestive than any of Marsh's conduct.

Second, whatever was Marsh's conduct with Dennison and Benson, it all occurred away from the work place. None of Digital's policies purport to apply to employees while they are away from the plant and not working. In the "Employee Conduct Statement" of Digital's orientation handbook, "Digital and You," it is stated, "Digital strives to create and maintain a positive work environment." Nothing in the handbook suggests that any employee conduct outside the work environment is unacceptable. In another context, conflict of interest, the handbook states, "Digital respects your right to engage in activities outside of your employment that are of a private nature."

Marsh was not discharged because he was a man who had kissed a female subordinate and had previously engaged in unacceptable conduct with another woman. He was discharged because he was a black man who had kissed a white woman and (so DeBlasio believed) had previously engaged in unacceptable conduct with another white woman.

### 2. *Breach of Implied Contract*

■ While it is generally the rule that an employment contract for an unspecified

time may be terminated by either party at any time, Arizona recognizes an exception to the general rule when there is an implied-in-fact contract. *Wagenseller v. Scottsdale Memorial Hospital,* 147 Ariz. 370, 381, 710 P.2d 1025, 1036 (1985); *Leikvold v. Valley View Community Hospital,* 141 Ariz. 544, 688 P.2d 170 (1984). An implied-in-fact contract is one that is inferred from the statements or conduct of the party. *Wagenseller,* 147 Ariz. at 381, 710 P.2d at 1036. Statements in an employee's manual may establish the existence of an implied-in-fact contract. *Id.*

█ Marsh contends that the "Digital and You" handbook and the various policies and procedures issued to the supervisors created an implied-in-fact contract. However, the policies and procedures were issued to the supervisors to guide them in their dealings with other employees and certainly were not in any way impliedly creating a contract between Digital and its supervisors. The handbook states, "In general, employees can anticipate that actions harmful to another employee or to the company are cause for disciplinary procedures or possible dismissal." The addition of "or possible dismissal" negates any contention that Digital impliedly contracted with its employees that no employee would be discharged except as the fourth and final step of the disciplinary procedure. Marsh's breach of implied contract claim must be denied.

### 3. *Damages*

█ A prevailing plaintiff in a Section 1981 action may recover compensatory and punitive damages. *Williams v. Owens-Illinois, Inc.,* 665 F.2d 918, 928–29 (9th Cir. 1982). Compensatory damages include recovery of lost pay and damages for suffering and emotional distress. *Stallworth v. Shuler,* 777 F.2d 1431, 1435 (11th Cir.1985); *Wilmington v. J.I. Case Co.,* 793 F.2d 909, 922 (8th Cir.1986). Punitive damages may be assessed when "the defendant's conduct ... involves reckless or callous indifference to the federally protected rights of others." *Stallworth v. Shuler,* 777 F.2d at 1435. When back pay is awarded, prejudgment

interest should be assessed. *Crawford v. Roadway Express, Inc.,* 485 F.Supp. 914, 923 (W.D.La.1980).

When Marsh was discharged on July 1, 1983, his annual salary and shift differential pay totaled $28,302.56. His lost pay from July 1 to October 20, 1983, was $8,647.87, and prejudgment interest on this amount will be awarded at the rate of 10% per annum from October 21, 1983.

█ Marsh could reasonably have expected a 5% pay increase commencing October 21, 1983. From that date until January 31, 1984, he would have earned $8,254.90, and prejudgment interest will be awarded on that amount from February 1, 1984.

Marsh worked for another company from February to May of 1984 and during those four months earned $9,333.33. Had he remained at Digital he would have earned $9,905.88 or $572.55 more than what he earned at the other company. Prejudgment interest on this difference will be allowed at the rate of 10% per annum from June 1, 1984.

On August 20, 1984, Marsh was employed by the company that is his present employer at a salary of $24,600 per year. Had he been employed by Digital from June 1 to August 19, 1984, he would have earned $6,607.42. Prejudgment interest on that amount will be awarded at the rate of 10% per annum from August 20, 1984.

Marsh would have earned $4,952.94 had he been employed by Digital from August 21, 1984, to October 20, 1984, and he actually earned $4,200 during that time, a difference of $752.94. Prejudgment interest at the rate of 10% per annum will be awarded from October 21, 1984.

Marsh could reasonably have expected another 5% increase in pay effective October 21, 1984, which would have raised his annual pay to $31,203.57. Between October 21, 1984, and March 15, 1985, his loss of pay from Digital totaled $12,486.44 and his pay from his present employer totaled $9,840, a difference of $2,641.44. Prejudgment interest at the rate of 10% per annum will be awarded on this difference commencing March 15, 1985.

On March 15, 1985, Marsh's present employer raised his salary to $27,000 per year. From that date to October 20, 1985, Marsh would have earned $18,722.16 had he remained at Digital, and he earned $16,200 at his present employment, leaving a difference of $2,522.16. Prejudgment interest at the rate of 10% per annum will be awarded on this difference from October 20, 1985.

Marsh could reasonably have anticipated another pay increase of 5% effective October 21, 1985, which would have raised his annual pay to $32,763.75. Between that date and August 12, 1986, Marsh would have earned $26,750 at his present employment, leaving a difference of $4,643.17. On August 12, 1986, his present employer raised Marsh's salary so that he was earning more than he would have earned working for Digital. Prejudgment interest from August 12, 1986, at the rate of 10% per annum will be awarded on Marsh's loss between March 15, 1985, and August 12, 1986.

■ Marsh will be awarded $15,000 as damages for the embarrassment, humiliation and anxiety that he suffered as a result of his discharge.

■ Punitive damages are appropriate. The evidence establishes a reckless indifference to Marsh's federally protected rights. Although an employee had told DeBlasio that the complaints against Marsh were racially motivated, although the same reason for the complaints had occurred to him, and although he was concerned that some of the employees might have been complaining about Marsh as retaliation, he would not budge from his determination to discharge a black man who had been with Digital for almost 11 years and against whom no complaint of sexual harassment had ever been lodged. Other than interviewing the complaining women, he and Belton–Willis made no further investigation. Neither would tell Marsh who had complained against him or give him any specifics. Had either done so Marsh might well have been able to refute the charges.

To make matters worse, Digital distorted the reasons for Marsh's discharge when he applied for unemployment compensation.

Punitive damages in the amount of $50,000 will be awarded.

## ORDERS

IT IS ORDERED that plaintiff take nothing on his claim for damages for breach of implied contract and that judgment be entered in favor of defendant on the breach of implied contract claim.

IT IS FURTHER ORDERED that plaintiff have judgment against the defendant on his racial discrimination claim and that judgment be entered in his favor and against the defendant in the sum of $49,642.45 as compensatory damages.

IT IS FURTHER ORDERED that the plaintiff recover prejudgment interest at the rate of 10% per annum as follows:

1. On $8,647.87 from October 21, 1983.
2. On $8,254.90 from February 1, 1984.
3. On $572.55 from June 1, 1984.
4. On $6,607.42 from August 20, 1984.
5. On $752.94 from October 21, 1984.
6. On $2,641.44 from March 15, 1985.
7. On $2,522.16 from October 20, 1985.
8. On $4,643.17 from August 12, 1986.

IT IS FURTHER ORDERED that judgment be entered in favor of plaintiff and against the defendant for $50,000 as punitive damages.

IT IS FURTHER ORDERED that interest on the total amount of the judgment shall be at the rate of ___% per annum.

IT IS FURTHER ORDERED that plaintiff submit an application for an award of attorney's fees within 30 days.