[No. A038686. First Dist., Div. Five. Apr. 14, 1988.]

DENNY WALSH et al., Plaintiffs and Appellants, v.
EDWARD D. BRONSON et al., Defendants and Respondents.

**COUNSEL**

Thomas E. Kotoske for Plaintiffs and Appellants.

Joseph W. Rogers, Jr., Susan M. Popik, William B. Chapman and Rogers, Joseph, O'Donnell & Quinn for Defendants and Respondents.

**OPINION**

**HANING, J.**—Appellants Denny Walsh, Jerry Bier, and Jimmy McClung appeal from a summary judgment in favor of respondents Edward D. Bronson, Robert J. Stumpf, and Patricia H. Cullison on appellants' complaint for malicious prosecution and conspiracy. Appellants contend there are triable issues of fact as to whether respondents, who are attorneys, (1) had probable cause to file a defamation action on behalf of their client against appellants; and (2) conspired to file the defamation action without probable cause. We affirm.

Appellants are a team of newspaper reporters who wrote a series of articles on alleged political corruption and organized criminal activity in

the Fresno area. As a result of these articles a libel suit was filed against them by Vincent Todisco, the person they named as the central figure involved. During his deposition in the Todisco action appellant Walsh identified Edward Kashian as a member of the Fresno "Mob." Four days later the Fresno Bee published a news story of the Walsh deposition, entitled "Documents Tie Crime to Fresno Officials, Businessmen." The story reported that businesses with which Kashian was associated, primarily Fresno Ecological, a waste disposal company, were infiltrated by organized crime and that Walsh had named Kashian as a member of the "Fresno Mob." On the same day the same article appeared in the Sacramento Bee, with the headline "Mob Reportedly Infiltrated Businesses." As a result of the Bee articles, Kashian retained respondents to represent him in a possible defamation action. Respondents filed such an action against, among others, appellants and their employer, McClatchy Newspapers, Inc. (McClatchy), publisher of the Bee newspapers.

One year later Kashian voluntarily dismissed his action against appellant Bier without prejudice, and shortly thereafter Bier brought the instant action against respondents. Three years later Kashian and McClatchy settled the defamation action. Pursuant to their settlement agreement, Kashian's action was "dismissed with prejudice as to all parties"; McClatchy donated to Stanford University's Department of Communications the amount of Kashian's attorney fees ($415,000); McClatchy published a clarification of its articles to the effect that the Bee has never taken the position that Kashian was ever a member of organized crime or involved in criminal activity; and the "see" references to organized crime on Kashian's file in the newspapers' "morgue" files were removed. Appellants Walsh and McClung did not participate in the settlement negotiations and were not party to the settlement agreement between Kashian and McClatchy—in fact, for purposes of this appeal we can accept appellants' position that they were opposed to McClatchy's terms. Following the dismissal, they then filed their actions for malicious prosecution against respondents, which were then joined with the prior action filed by Bier.

The rules for review of summary judgment are well established and require no detailed repetition. (See, e.g., *Empire West* v. *Southern California Gas Co.* (1974) 12 Cal.3d 805, 808 [117 Cal.Rptr. 423, 528 P.2d 31]; 6 Witkin, Cal. Procedure (3d ed. 1985) Proceedings Without Trial, § 274 et seq.) It suffices to say that "The motion for summary judgment shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).)

To sustain an action for malicious prosecution of a civil proceeding the plaintiff must establish that the prior action: (1) terminated in his or her

favor, (2) was filed without probable cause and, (3) was initiated by the defendant(s) with malice. (*Bertero* v. *National General Corp.* (1974) 13 Cal.3d 43, 50 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878]; 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 255.) If, as a matter of law, the plaintiff is unable to establish any of these prerequisites, the action fails. ■ For purposes of summary judgment proceedings, if the defendants "conclusively negate a necessary element of the plaintiff's case or establish a complete defense and thereby demonstrate that under no hypothesis is there a material factual issue which requires the process of a trial," they are entitled to summary judgment. (*Vanderbilt Growth Fund, Inc.* v. *Superior Court* (1980) 105 Cal.App.3d 628, 633-634 [164 Cal.Rptr. 621].)

■ Respondents effectively negate a necessary element of appellants' malicious prosecution action if they can conclusively establish that at the time the underlying libel action was filed they had probable cause to believe that appellants published false, defamatory and unprivileged information about respondents' client. (Civ. Code, §§ 45, 47.)

■ "[T]he facts to be analyzed for probable cause are those known to the defendant [in the malicious prosecution action] at the time the underlying action was filed. [Citation.]" (*Williams* v. *Coombs* (1986) 179 Cal.App.3d 626, 632, fn. 4 [224 Cal.Rptr. 865]; see also *Zurich Insurance Co.* v. *Peterson* (1986) 188 Cal.App.3d 438, 448 [232 Cal.Rptr. 807].) As it pertains to attorney defendants in a malicious prosecution action, probable cause is measured "by whether a prudent attorney, after such investigation of the facts and research of the law as the circumstances reasonably warrant, would have considered the action to be tenable on the theory advanced. . . . To meet the objective standard, the attorney must not prosecute 'a claim which a reasonable lawyer would not regard as tenable or by unreasonably neglecting to investigate the facts and law in making his determination to proceed, . . .' [Citation.]" (*Williams, supra,* at p. 639.)

■ " '[W]hether the defendant had or had not probable cause for instituting the prosecution is always a matter of law to be determined by the court. If the facts upon which the defendant acted are undisputed, the court, according as it shall be the opinion that they constituted probable cause or not, either will order a nonsuit (or direct a verdict for the defendant), or it will submit the other issues to the jury; but whether admitted or disputed, the question is still one of law to be determined by the court from the facts established in the case. If the facts are controverted, they must be passed upon by the jury before the court can determine the issue of probable cause; but the question of probable cause can never be left to the determination of the jury.' [Citations.]" (*Williams* v. *Coombs, supra,* 179 Cal.App.3d

at p. 636.) While appellants herein argue at length about what respondents *should* have done before filing Kashian's lawsuit, there is no dispute about respondents' preparation and knowledge prior to filing the action. "Since the material facts relating to [respondents'] factual investigation and legal research are undisputed, the question of whether those facts, including their reasonableness, gave rise to probable cause was a legal one for the court." (*Id.,* at pp. 637-638.)

■ Appellants contend that respondents could not have had probable cause that appellants, whose names did not appear in by-lines on the Bee articles, actually published the alleged defamatory material. ■ However, "[t]he general rule for defamation is that everyone who takes a responsible part in the publication is liable for the defamation." (*McGuire* v. *Brightman* (1978) 79 Cal.App.3d 776, 789 [145 Cal.Rptr. 256], citing Prosser, Law of Torts (4th ed. 1971) § 113.)

In support of their motion respondents filed the following declaration by Bronson: After his initial lengthy interview with Kashian, he reviewed portions of the court file in the Todisco action, including appellant Walsh's deposition. He consulted with various Fresno lawyers connected with the Todisco action and learned that appellants had been working as an investigative reporting team for several years, that Walsh was the leader, that appellants jointly researched and wrote the article leading to the Todisco action, and that they had a reputation for operating on rumor. He further learned that appellants Walsh and McClung had a conversation with their former attorney during which they indicated they had prepublication knowledge of the article and its contents. Appellants told the attorney the article would be unfavorable to him, then discharged him, and hired their present attorney, who appeared with Walsh at his deposition. Bronson further learned that the circumstances of the Walsh deposition in the Todisco action were unusual. Although Walsh's deposition was noticed and taken by Todisco's attorneys, Walsh's new attorney took over the interrogation and, after Walsh had named several people involved with the Fresno "Mob," began to "lead" Walsh by suggesting additional names. The documents Walsh produced at his deposition seemed inappropriate to its purpose. The part of the deposition in which Walsh made his defamatory remarks about Kashian was taken on a Thursday in Sacramento, was transcribed overnight before the deposition was completed, then reviewed and signed by Walsh and flown immediately to Fresno where "reporters and attorneys were apparently waiting to work over the weekend" on the article which appeared on Monday.

Respondent Stumpf's declaration states that before filing the amended complaint he interviewed the former Fresno District Attorney who, in

1973-1974, had conducted a personal investigation into the background of several persons involved with Fresno Ecological for possible organized crime involvement. The District Attorney concluded that Kashian was not implicated in any wrongdoing and made a full report of his investigation to appellants Walsh and McClung in 1978. He agreed to cooperate fully with appellants in their investigation, but advised them that Fresno was a "rumor mill" producing many stories of supposed organized crime that had no basis in fact. When he warned them that defamation actions could result from untrue statements, one of them replied, "We don't have to worry about lawsuits. Our boss [McClatchy] has plenty of money and will do whatever is necessary."

Stumpf also interviewed appellants' former attorney. That attorney told Stumpf that two weeks before the Bee article appeared, Walsh and McClung notified him that his name would "in all likelihood" appear in a negative light in an upcoming article. The attorney was certain that the Bee article was prepared substantially in advance of its publication date with assistance from Walsh and McClung. The Bee article did, in fact, name the attorney as involved in narcotic trafficking and other criminal activity. Before interviewing appellant's original attorney, Stumpf had learned that the attorney apparently told Kashian that several months before the article appeared it was "killed" by McClatchy's in-house attorney out of concern as to whether there were facts to back up the article, but the attorney declined to confirm this to Stumpf during their interview, apparently because of his concern over the attorney-client privilege.

Stumpf discovered that appellant McClung was present throughout Walsh's deposition. Stumpf considered the leading questioning by Walsh's attorney during the deposition to be unrelated to Walsh's defense. He learned that Todisco's lawyer, who would normally have conducted the questioning of Walsh, was surprised by the questioning arrangement, by the filing of the partial transcript of the Thursday testimony as a separate document, and by the extraordinary efforts to transcribe and transport to Fresno the partial deposition. Todisco's attorney thought "all the hubbub" was unnecessary, and believed the other lawyers at the deposition had taken advantage of him. Stumpf learned that the day following Walsh's deposition, McClatchy applied for, and received, an ex parte order from the trial court directing that the portion of Walsh's deposition mentioning Kashian be immediately filed as part of the record in the Todisco action, purportedly to assist the court in ruling upon discovery disputes. However, while the portion of the deposition during which Kashian's name arose was filed before the article appeared, neither the balance of the deposition nor the exhibits were filed until after the article's publication.

 We conclude that respondents' research and investigation established probable cause for them to believe that appellants participated in the publication of the subject articles. The information respondents obtained revealed that appellants had been actively investigating organized crime in Fresno on behalf of the Bee for several years, were familiar with possible participants and provided other journalists with information, including rumors, about them. Appellants revealed their awareness of an incriminating article dealing with subject matter which they had been actively pursuing, several weeks before it appeared in the paper. The manner in which the deposition was conducted, with its leading questions, its rapid transcription and transportation to Fresno, and the ex parte order for its filing strongly suggests that Walsh used the forum of the deposition as a means of delivering Kashian's name to the newspaper for use in the subject articles.

We also conclude that respondents had probable cause to believe the publication was false. Bronson's declaration reveals he had several lengthy meetings and numerous telephone conversations with Kashian. Bronson asked detailed questions regarding any contacts Kashian may have had with organized crime in Fresno, and was advised that Kashian had none. They went over the Bee articles in great detail. Kashian had met several of the people mentioned therein, but had no substantial relationship with any of them. Kashian told Bronson that a former Fresno councilman had been indicted for taking a bribe from Fresno Ecological, a business in which Kashian had once had an interest, but the indictment was after Kashian had sold his interest. Upon learning that an employee of Fresno Ecological had a criminal record, Kashian insisted the employee be terminated. Kashian also told Bronson that the former Fresno police chief telephoned him after publication of the article to say he knew Kashian was not connected with any criminal activity.

Stumpf's declaration states that he reviewed the Todisco article, Walsh's deposition and the exhibits attached thereto, and the Bee articles. He also had many conferences with Kashian and asked him specific questions regarding criminal activity and connection with organized crime. Kashian provided Stumpf with an "exhaustive" exposition of his connection with Fresno Ecological and its problems. Stumpf spoke with a number of Fresnans who vouched for Kashian's good reputation in the community. Stumpf learned that the only reference to Kashian in the documents Walsh produced at his Todisco deposition were two 1973 memos by P. A. Crim, a special agent of the California Department of Justice's organized crime branch, then collecting local police gossip. (The Todisco article appeared in 1979 and Walsh's deposition was in 1982.) Agent Crim cited the former Fresno police chief as one source of the gossip about Kashian. Stumpf interviewed the police chief, who denied speaking with Crim on any occa-

sion and believed Crim did not have a good reputation as an investigator. The police chief had investigated persons associated with firms submitting proposals to Fresno for waste disposal contracts, including Fresno Ecological; none of the reports had any adverse information about Kashian.

Stumpf's interview with the former Fresno District Attorney, who was among those Walsh listed during his deposition as a member of the Fresno "Mob," revealed that the district attorney had conducted a personal investigation of certain persons connected with Fresno Ecological in 1973 and 1974. As we previously mentioned, his investigation led him to conclude that Kashian was not involved in any criminal activity. The district attorney was aware of Crim's 1973 investigations, but he did not believe Crim was a competent investigator. Crim had attempted to block an official investigation, which the district attorney was able to prevent only by complaining to the attorney general. The district attorney made a full report of his investigation and of Crim's incompetence and unreliability to appellants Walsh and McClung in 1978 and 1979. He met with them on numerous occasions, telling them that his investigation of Kashian revealed no wrongdoing and that the rumors about Fresno Ecological had been thoroughly investigated and had no basis in fact. McClung told the district attorney he had a meeting scheduled with C. K. McClatchy which he was dreading, because McClatchy had spent a great deal of time, money, and effort on the organized crime investigation and the reporters had little to show for it. Stumpf also interviewed Todisco's attorneys, who expressed no doubts about Kashian's honesty or integrity.

These declarations and other supporting documents establish that respondents had probable cause to believe that the publication at issue was false. Respondents reviewed the pertinent documents, including the Todisco article, the Bee articles which prompted the Kashian lawsuit, Walsh's deposition, and the exhibits he produced therein. They interviewed persons who figured prominently in the articles and exhibits and the key figures in the Todisco action. They independently checked their client's reputation in the community. They had frequent and detailed conferences with their client concerning the salient facts, and reviewing and corroborating with him the results of their research. They did not rely simply on their client's word, but conducted a thorough investigation of the relevant factors.

The final inquiry concerning probable cause is whether respondents reasonably believed the publication was not privileged. Pursuant to Civil Code section 47, subdivisions 2 and 4, a privileged publication is one made "in any . . . judicial proceeding, or . . . [b]y a fair and true report in a public journal, of [a] judicial . . . or other public official proceeding, or . . . anything said in the course thereof . . . ." Respondents' declarations state

that preparatory to filing Kashian's defamation action they researched the law of defamation, reviewing particularly *Bradley* v. *Hartford Acc. & Indem. Co.* (1973) 30 Cal.App.3d 818 [106 Cal.Rptr. 718].

In *Bradley,* attorney Bradley represented an injured plaintiff in a personal injury action. Following the trial thereof he brought a defamation action against Hartford. He alleged, inter alia, that (1) while the personal injury action was pending Hartford caused certain extrajudicial documents, not appropriately part of the personal injury action, to be filed with both the Supreme Court and trial court for the sole purpose of having the defamatory statements contained therein quoted and republished in the news media, (2) in furtherance of this purpose Hartford falsely represented to the newspaper that the documents proved that Bradley had collusively prevailed upon the defendant in the personal injury action to give false and perjured testimony favorable to the plaintiff, and (3) Bradley was therefore guilty of suborning perjury, manufacturing evidence and conducting himself in an unprofessional and illegal manner. Hartford claimed an absolute privilege under Civil Code section 47, subdivision 2. (*Bradley* v. *Hartford Accident & Indemnity Co., supra,* 30 Cal.App.3d at p. 826.)

*Bradley* held that Hartford was not protected by the absolute privilege. "[A]bsolute privilege in judicial proceedings is afforded only if the following conditions have been met: the publication (1) was made in a judicial proceeding; (2) had some connection or logical relation to the action; (3) was made to achieve the objects of the litigation; and (4) involved litigants or other participants authorized by law." (*Bradley* v. *Hartford Accident & Indemnity Co., supra,* 30 Cal.App.3d at p. 825.) The court reasoned that although "some relationship" existed between publication of the documents and the personal injury action, that requirement, standing alone, does not constitute an absolute privilege, particularly when there is nothing to suggest that the publication was made to achieve the objects of the litigation. "On the contrary, it affirmatively appears . . . that the documents . . . were filed as a part of a conspiracy for the sole purpose of having the defamations contained therein republished by the news media, that is, to bring the defamatory matter within the protective shield of the absolute privilege and then to spread it with impunity. It is easily discernible what result would ensue should we condone such an apparent ruse by providing absolute immunity to the resourceful slanderer. . . . All that the slanderer would have to do to avoid the consequences of his evil act would be to file the defamatory matter with the court first, then republish it as an absolutely privileged matter to the news media . . . thereby converting the litigation in the court into litigation in the press . . . . [¶] . . . [¶] ▪ Finally we observe that the fact that a defamatory statement was initially protected by an absolute privilege because it was uttered on a privileged occasion by

persons who are covered by the privilege does not include a full scale, blanket authorization to republish the same on a nonprivileged occasion to persons to whom the privilege is not applicable." (*Id.,* at pp. 826-827.)

 At the time respondents filed the Kashian defamation action, *Bradley* had not been overruled by the Supreme Court nor questioned by other Courts of Appeal. Therefore, respondents were entitled to rely on its authority. (See *Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].) Based on their information and research they could reasonably believe Walsh's statement about Kashian was of dubious connection to the Todisco defamation action, and that it was not necessary for Walsh to defame Kashian in order to achieve his objective in the Todisco case. Moreover, given appellants' long-standing association with the Bee and organized crime investigation, McClung's appearance at Walsh's deposition, and the unusual procedure of the deposition and its aftermath and immediate publication of the Bee articles, there existed a strong inference that Walsh uttered his statement about Kashian with the express objective of attempting to cloak the subsequent publication with the privilege. Thus, respondents could reasonably believe that the subject publication was not privileged.

Based on the foregoing, we conclude that the facts which were indisputably in respondents' possession at the time they initiated the underlying action gave rise to probable cause to believe the action was meritorious.

As indicated previously, appellants devote much of their efforts to suggesting alternative methods of investigation which they contend respondents should have employed. That, however, is not the test. We are not concerned here with the manner in which respondents acquired probable cause, but whether, as a matter of law, they had acquired it.[1]

 For the foregoing reasons we also conclude that respondents have negated the element of malice. Appellants' sole contention regarding the existence of malice is the observation that it can be inferred from a lack of probable cause. Since we have concluded that probable cause was present, we also conclude that malice is nonexistent. The thoroughness of respondents' research and investigation negates any possible inference of malice. (See *Grindle* v. *Lorbeer* (1987) 196 Cal.App.3d 1461 [242 Cal.Rptr. 562].)

 Finally, since respondents' participation in Kashian's defamation action did not constitute malicious prosecution, appellants' conspiracy theo-

---

[1] Obviously, we express no opinion about the merits of the underlying action, since the settlement foreclosed a trial record. We mention this only because appellants devoted their oral argument to a discussion of substantial evidence of the merits of the libel action. We determine only the existence of probable cause.

ry also fails. There is no cause of action for conspiracy per se, and a civil conspiracy does not give rise to a cause of action "unless a civil wrong has been committed . . . ." (*Unruh* v. *Truck Insurance Exchange* (1972) 7 Cal.3d 616, 631 [102 Cal.Rptr. 815, 498 P.2d 1063]; *Orloff* v. *Metropolitan Trust Co.* (1941) 17 Cal.2d 484, 488 [110 P.2d 396]; *Vargas* v. *Giacosa* (1953) 121 Cal.App.2d 521, 524 [263 P.2d 840].)

The summary judgment is affirmed.

Low, P. J., and King, J., concurred.