Walter GREENE, Jr., Plaintiff,

v.

ARMCO, INC., et al., Defendants.

No. CV 83–1196 MRP.

United States District Court, C.D. California.

Sept. 1, 1988.

Law Offices of Walter Greene, Jr., P.C., Santa Ana, Cal., for plaintiff.

James L. Meeder, Mark S. Dyl, Brobeck, Phleger & Harrison, Los Angeles, Cal., for defendants.

## OPINION

PFAELZER, District Judge.

Plaintiff Walter Greene, Jr. sues Armco, Inc. ("Armco"), the law firm of Brobeck, Phleger & Harrison ("Brobeck"), and two of Brobeck's members, attorneys James L. Meeder and William C. Anderson, for malicious prosecution, interference with prospective business advantage, and violations of 42 U.S.C. § 1981. The malicious prosecution claim is based on an abuse of process action that the defendants formerly brought against Greene. The interference with prospective business advantage claim is based on statements Meeder made to the California State Bar regarding Greene's fit-

ness to practice law. The § 1981 claim is based on the termination of Greene's employment with a subsidiary of Armco, Bellefonte Reinsurance Company ("Bellefonte" or "the company"). The defendants have moved for summary judgment as to each of the three claims. The Court now grants the defendants' motion.

## I. Background

This is one of eleven cases filed in state and federal courts involving this plaintiff and these and other defendants arising out of the termination of the plaintiff's employment with Bellefonte. The volume of litigation does not reflect the complexity of the dispute that generated it. Indeed, the underlying facts are simple, albeit somewhat unusual.

Greene commenced work as a reinsurance underwriter for Bellefonte at its San Francisco office in 1978. On October 19, 1979, Bellefonte gave Greene a written offer of promotion to Regional Manager of a Los Angeles office that Bellefonte planned to open in August 1980. The promotion and a pay raise were to be effective March 1, 1980. On October 26, 1979, Greene accepted this offer in writing, thereby achieving the highest position of any black in that company, and perhaps in the entire reinsurance industry. *See Greene v. Cohen, et al.,* No. 81–4386, Reporter's Transcript of Proceedings 317, 329 (hereinafter "TR at ...") (testimony of Ronald Talmo). The next day, Greene made an offer on a house in Anaheim that he and his wife had found during an exploratory trip to Southern California, made in anticipation of relocation. *See* TR at 410–11. Agreeing with Greene that the Anaheim house was a bargain, Armco consented to its purchase in advance of the opening of the branch office. In order to assist Greene in the purchase of the Anaheim house, Armco loaned Greene and his wife, Katherine Greene, $72,500 with interest at 15% per annum ("the loan"). Armco waived the interest payments for three months and Bellefonte gave the Greenes $2,400 to cover the fourth and fifth month interest payments. The Greenes closed on the purchase of the Anaheim house on February 1, 1980, but continued to live in their Bay Area home.

On April 9, 1980, Bellefonte cancelled its plans to open a Los Angeles branch office. It is undisputed that the cancellation was necessitated by the impact on Bellefonte's business of an unanticipated reduction in its "BEST" rating. That day, John Linneman, Regional Manager of Bellefonte's San Francisco office and Greene's immediate supervisor, informed Greene of the decision and told him that BNellefonte would make sure that he and his family did not suffer financially as a result of the cancelled move. Greene was told that if he could not sell the Anaheim house, Bellefonte would buy it back from him at market value, or his purchase price, whichever was higher. Greene also was told that the interest on his loan would be deferred for 30 to 60 days to provide him time to try to sell the house on his own. The following day, Greene wrote a memorandum to his supervisor, acknowledging that the agreement to move him to Los Angeles was "voided." At the time, the company had no knowledge that Greene's memorandum did not reflect his real intentions. After April 9, he did not put his Anaheim home on the market, did not take his Bay Area home off the market, enrolled his children in Anaheim schools, and enrolled himself in a Southern California law school.

The first indication to Bellefonte that things were not going as it had anticipated came on May 5, 1980 when Greene wrote to Linneman to complain that he was unsure about his status with Bellefonte and that he had asked the Equal Employment Opportunities Commission ("EEOC") to make an investigation. The next day Greene met with Linneman to discuss the May 5 letter, at which time Greene stated that he intended to move to Anaheim and sue Bellefonte for expenses. He also stated that he thought he would make a sympathetic witness before a jury. Greene was told that a move to Anaheim was unacceptable and that Bellefonte would not finance it.

On May 7, 1980, Greene flew to Los Angeles and registered and paid the tuition for two summer law school classes at

Western State University Law School in Fullerton, California. He then submitted to Bellefonte a written request for tuition reimbursement. Bellefonte had been reimbursing Greene for tuition expenses at a Bay Area law school, but rejected this request to fund classes because of the school's location. Greene wrote a letter of protest, in which he argued that the classes were on weekends and thus would not create insurmountable commuting problems. In fact, one of the classes met on a weeknight. Greene did not mention in the letter that he intended to live in Anaheim.

On May 15, 1980, Bellefonte flew Greene to its corporate offices in Ohio to discuss his dissatisfaction with Bellefonte. Greene was told that Bellefonte wanted him to stay and that a proposed solution would be sent to him in two weeks. On May 28, 1980, Greene entered into a contract for the sale of his Bay Area home. On May 29 and 30, he moved his family and possessions to the Anaheim house and charged the expenses to Armco.

Unaware that Greene had moved to Anaheim, Bellefonte officials met on May 30 to discuss what should be proposed to Greene. It was agreed that Greene would be given two options: (A) Greene would remain with Bellefonte as Regional Casualty Manager and receive a raise as well as reimbursement for the expenses of his abortive move to Anaheim; or (B) Greene would leave Bellefonte and receive the paid services of an executive search firm in Los Angeles, retention on the payroll for one month, two weeks severance pay, and, if Greene desired, the purchase of the Bay Area home by Bellefonte and relocation expenses to Los Angeles.

On June 2, 1980, Greene flew, at Bellefonte's expense, from Southern California to Oakland, rented a car, and drove to Bellefonte's San Francisco office. While in the office, he called Dan Cohen, Bellefonte's personnel manager who was located at the company's headquarters in Ohio, and told Cohen that he had a contract to sell his Bay Area home. Greene did not mention that he had already moved to Anaheim.

On June 5, 1980, Bellefonte flew Greene to the Ohio offices to present him with options A and B. Greene indicated that he would probably accept option A and remain with Bellefonte, but raised the problem that he had already contracted for the sale of his Bay Area home. Cohen suggested that Greene discuss with his realtor the possibility of getting out of the contract.

On June 10, Greene again flew to San Francisco at Bellefonte's expense and went to the company's office. On the telephone, he discussed the contract for sale of his Bay Area home with Cohen. Cohen told Greene that Bellefonte would not finance Greene's move to another Bay Area house. At that point, Bellefonte's legal counsel, Griffith Perry, joined the conversation and asked Greene to send him a copy of the agreement to see if there might be some way out of it. Perry also told Greene that he would send him a letter stating that Bellefonte would indemnify him for any liability that might result from Greene's failure to perform the contract of sale. Greene still did not mention that he had already moved to Anaheim. Greene flew back to Southern California on June 10 and never again appeared in Bellefonte's San Francisco office, nor performed any services for Bellefonte.

Instead, Greene began his summer law school courses at Western State University on June 13, 1980. He added a third class to his schedule, and began attending Monday and Tuesday evenings as well as Saturdays. On June 29, Greene filed a written request to attend classes full time in the Fall of 1980.

Meanwhile, when no one at Bellefonte had heard from Greene by June 24, Linneman sent Greene a memorandum requesting advance notice of any future time off from work. The memorandum was sent to Greene's Bay Area home because Linneman believed Greene still lived there. Cohen wrote to Greene to ask him to let Bellefonte know by July 10 if he had decided to accept option A or B. This letter was also sent to the Bay Area home because Cohen believed that Greene still lived there.

On July 7, Greene called Bellefonte's San Francisco office and dictated to Linneman's secretary a response to Linneman's June 24 request for advance notice of vacation time. Greene's dictated memorandum stated in part:

John, be serious. That letter is assinine [sic] even for you. . . . It may appear to you that my choice is to accept Option B. I have, however, my own option which I shall call C, that is, to continue to look for a more equitable solution. I hope to have something definitive for you to consider within a week.

John, if you really have problems with a schedule, let me suggest one. Arrive at the office tomorrow at about 10:30. At 11, leave for lunch. At 3, arrive back at the office carrying a Big Mac, and singing "We are off to see the Wizard." Sign those papers and documents ready for your signature, make a few personal phone calls, and then leave between 4 and 4:30 for the Conference Room or Royal Exchange for a few horns.

Linneman immediately informed Cohen and D.J. Carbine, Bellefonte's Chief Operating Officer, of the contents of this memorandum.

On July 8, Carbine decided to terminate Greene's employment with Bellefonte. He waited until July 10 to inform Greene of this decision because Cohen's July 1 letter had asked Greene to respond by July 10. When Cohen had not received a response from Greene by that date, Carbine and Cohen wrote to Greene and told him he was terminated as of July 11 due to his insubordinate memo, his lack of performance during the past months, and his excessive absenteeism during 1980.

On July 14, Cohen received a call from Armco's relocation department regarding payment for Greene's moving expenses. This was the first time that Cohen had any knowledge that Greene had moved to Anaheim at the end of May. Cohen immediately telephoned Greene in Anaheim and informed him of his termination. He told Greene that he must return his Bellefonte credit cards and repay the $72,500 loan, with interest.

In spite of those instructions, Greene used his Bellefonte credit cards again on July 23, 1980 to finance a trip to Oakland to close the escrow on his home there. On that day, Greene received a check in excess of $81,000, which represented the equity he had in his Bay Area home. He then invested a large portion of this money in the stock market.

On August 1, 1980, Bellefonte formally requested that Greene repay the $72,500 loan. On August 8, Bellefonte received a letter from Ronald Talmo, Greene's attorney, which stated in pertinent part:

On behalf of my client, Walter Greene, your demand of $72,500 plus interest from March 21, 1980, is rejected. Mr. Greene intends to retain the equity advance moneys as a partial offset for the precarious position Bellefonte has created.

Any effort to now collect the $72,500 and whatever sums have been advanced or claimed due will result in a terribly involved lawsuit in which we will raise and vigorously pursue all counterclaims available. I do not believe Armco or Bellefonte would want their internal operations subject to such scrutiny nor would want themselves exposed to such potential liability.

I suggest that we let things remain the way they are.

Thereafter, Greene proceeded to carry out this threat. By engaging Bellefonte in "terribly involved" litigation, he has avoided the repayment of the loan and cash advances for almost eight years.

A. *Greene I*

In March 1981, Armco sued Walter and Katherine Greene in the Northern District of California to recover the $72,500 loan, the interest thereon, and the money that had been advanced for moving expenses. *See Armco, Inc. v. Walter Greene and Katherine Greene*, No. 81–1231 EFL (*"Greene I"*). Greene counterclaimed against Armco and added cross-defendants Bellefonte, Cohen, Carbine, Linneman, and Perry, alleging fraud, negligent misrepresentation, wrongful discharge, breach of

contract, breach of the covenant of good faith and fair dealing, negligent performance of contract and failure to pay wages. On April 8, shortly after commencement of the suit, the California Unemployment Appeals Board found that Greene was not entitled to unemployment insurance because he had voluntarily abandoned his job on June 10, 1980, and had presented no evidence that he had been discriminated against by Bellefonte.

**B. Greene II**

In July 1981, the Greenes' motion to change the venue of *Greene I* to the Central District of California was denied. Shortly thereafter, in August 1981, Greene filed an action in the Central District arising out of the same operative facts that formed the basis for his counterclaims in the Northern District. *See Walter Greene v. Dan Cohen, et al.,* No. 81–4386 MRP (*"Greene II"*). The complaint in *Greene II* alleged that Greene had been discharged because of his race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* and 42 U.S.C. § 1981.

**C. Greene IA**

On September 15, 1981, Armco and Bellefonte filed an action in the Northern District against Walter and Katherine Greene for abuse of process. They alleged that Greene had threatened to use the judicial process to obtain the collateral advantage of delaying repayment of the $72,500 loan, and then proceeded to do so by filing fraudulent claims and counterclaims. *Armco, Inc., and Bellefonte Reinsurance Company v. Walter & Katherine Greene,* No. 81–3645 EFL (*"Greene IA "*). The Greenes counterclaimed for abuse of process. This action was stayed pending the resolution of *Greene I.*

**D. Greene III**

In *Greene I,* Judge Lynch entered summary judgment for Armco on the promissory note and dismissed the Greenes' counterclaim for fraud. At a court trial in January 1983, Judge Lynch awarded $109,-217.04 to Armco, which ruling the Greenes appealed. Judge Lynch also dismissed *Greene IA* on the authority of *Seidner v. 1551 Greenfield Owners Ass'n.,* 108 Cal. App.3d 895, 166 Cal.Rptr. 803 (1980), which ruling was not appealed by Armco and Bellefonte. On February 23, 1983, following the court trial of *Greene I* and the dismissal of *Greene IA,* Greene filed the present case, *Greene v. Armco, et al.,* CV 83–1196 MRP (*"Greene III"*). In *Greene III,* Greene alleges violations of Title VII, § 1981, malicious prosecution, and interference with prospective business advantage.

Following Judge Lynch's ruling, this Court dismissed the § 1981 claims in *Greene II* and *Greene III* on res judicata grounds. The Title VII claim in *Greene III* was dismissed as time barred. The malicious prosecution claim was dismissed on the ground that Greene had not shown that the underlying litigation, *Greene IA,* had terminated in his favor. The remaining claim was dismissed on the ground that defendant Meeder's communications to the state bar were privileged. Greene appealed those decisions.

**E. Greene IV**

On January 24, 1984, Katherine Greene sued Armco, Bellefonte, Broebeck, Meeder, and Anderson in state court for malicious prosecution. *See Katherine Greene v. Meeder, et al.,* No. 420885 (Super.Ct.) (*"Greene IV"*). *Greene IV* has been stayed, pending the resolution of *Greene III.*

**F. The Ninth Circuit Memorandum of Decision**

On January 25, 1984, the Ninth Circuit reversed the decisions in *Greene I, II,* and *III.* The Ninth Circuit reversed and remanded *Greene I* because the district court had used an incorrect standard in finding that no employment contract existed. The Ninth Circuit also reversed the dismissals of *Greene I* and *Greene II* because the reversal of *Greene I* eliminated its res judicata effect. Thereafter, *Greene I* was transferred to the Central District, consolidated with *Greene II,* and ultimately tried

before this Court on July 1, 11, 12, and 15 of 1985.

At the conclusion of the trial of *Greene I* and *II*, this Court found that Greene's claims were unsupported and ordered that they be dismissed on the merits. The Court also found that Greene and his wife brought the claims in *Greene I* and *Greene II* solely to avoid and delay payment of Armco's promissory note and imposed Rule 11 sanctions against the Greenes in the amount of $50,000. The Ninth Circuit affirmed this ruling, except for the calculation of interest, and denied the Greenes' petition for rehearing en banc.

### G. *Greene V*

Before *Greene I* and *II* went to trial on July 10, Greene filed an action in state court against Armco and Bellefonte for breach of contract. *See Greene v. Armco*, No. 426813 (Super.Ct. filed Apr. 9, 1984) (*"Greene V"*). *Greene V* was identical to one of the Greenes' counterclaims in *Greene I*. *Greene V* was removed to federal court and stayed pending the resolution of *Greene I* and *Greene II*. The case was remanded to state court on December 7, 1987 because the presence of Doe defendants destroyed diversity.

### H. *Greene VI, VII, VIII, IX*

The Greenes' lawsuits have not been limited to Walter Greene's former employer and its counsel. In 1981, Greene sued the California administrative law judges who denied him unemployment insurance benefits, along with Bellefonte, for violation of his rights to due process and equal protection. *See Greene v. Maxwell, et al.*, No. 357279 (Super.Ct.) (*"Greene VI"*). In 1981 and 1982, Greene filed two additional lawsuits challenging the denial of his unemployment benefits. *See Greene v. Califor-*

*nia Unemployment Ins. Appeals Board, et al.*, Nos. 352261 and 373552 (Super.Ct.) (*"Greene VII"* and *"Greene VIII"*). These three cases were dismissed by the state court for failure to bring them to trial within the time prescribed by law. In addition, in April 1985, the Greenes filed a related action against The Travelers Insurance Company, *Greene v. The Travelers Ins. Co., et al.*, No. 456736 (Super.Ct.) (*"Greene IX"*).

### I. *Greene X*

Greene also filed an action in state court against Gloria Zank, the State Bar of California, the Committee of Bar Examiners of the State Bar, and Mark C. Allen, in which he alleged that the defendants' actions in delaying his admission to practice law in California deprived him of his Constitutional rights in violation of 42 U.S.C. § 1983.[1] Ultimately the California trial court dismissed this case on the ground that judicial immunity shielded the defendants from liability, and the appellate court affirmed. *See Greene v. Zank*, 158 Cal.App.3d 497, 204 Cal.Rptr. 770 (1984).[2]

### J. *Greene XI*

Following the trial of *Greene I* and *II*, entry of judgment for Armco, and the Ninth Circuit's affirmance, the Greenes commenced an action in Superior Court against Brobeck, Armco, Meeder, the Honorable Mariana Pfaelzer, other unnamed and unserved co-conspirators, including judges of the Ninth Circuit, and Does 1–500. The complaint challenged the validity of the decisions issued in *Greene I* and *II* and alleged violations of civil rights guaranteed by the 7th and 14th amendments, violations of Article 1, Sections 7 and 16 of the California Constitution.[3]

---

**1.** Greene had passed the February 1982 bar exam, but was informed that his admission would be delayed pending a moral fitness investigation by the Committee of the Bar Examiners.

**2.** In originally rejecting Greene's application for admittance to the California Bar, the Committee of Bar Examiners found that Greene committed an abuse of process when he filed *Greene X* because it was filed for the purpose of intimidating the Bar and interfering with Greene's moral investigations. *See Greene I* and *Greene II*, Findings of Fact and Conclusions of Law ¶ 78, at 28.

**3.** The Greenes also filed for bankruptcy. This Court dismissed the bankruptcy petition because the Greenes' unsecured debts exceeded the limits imposed by the Bankruptcy Code and

After the Brobeck firm removed the action to federal court, Judge Marshall dismissed Judge Pfaelzer on immunity grounds and dismissed the other defendants on grounds of res judicata and failure to timely serve. *See Walter and Katherine Greene v. James Meeder, et al.,* No. 87-2621 (C.D.Cal. Aug. 31, 1987), *appeal docketed,* No. 87-6384 (9th Cir. Sept. 23, 1987) (*"Greene IX"*).

## II. Discussion

### A. *Malicious Prosecution*

In order to establish his claim for malicious prosecution, Greene must show that the abuse of process action ("the underlying action") was:

1) terminated in his favor;

2) brought without probable cause; and

3) initiated with malice.

*See Bertero v. National General Corp.,* 13 Cal.3d 43, 50, 118 Cal.Rptr. 184, 189, 529 P.2d 608 (1974). Summary judgment is appropriate if the defendants negate one of these essential elements of the offense. Although the abuse of process action was terminated in Greene's favor,[4] the Court grants summary judgment as to this claim because as a matter of law the defendants had probable cause to file the abuse of process complaint.[5] Further, Greene has

failed to carry his burden of showing that the action was filed with malice.

**1. The defendants had probable cause to file the abuse of process complaint**

■ The abuse of process complaint filed in September 1981 alleged that Greene and his wife filed claims and counterclaims against the defendants for the purpose of obtaining the unjustifiable collateral advantage of avoiding and delaying repayment of the $72,500 loan. The complaint alleged that Greene had first threatened to involve Armco and Bellefonte in a "terribly involved lawsuit" if they persisted in attempts to have the loan repaid, and then proceeded to carry out the threat by filing an EEOC complaint that Greene knew to contain false and misleading statements, filing numerous counterclaims in *Greene I,* and filing *Greene II* alleging claims based on the same facts as the *Greene I* counterclaims. At the trial of *Greene I* and *Greene II,* all of these allegations were established as true. *See Findings of Fact and Conclusions of Law,* ¶ 12 at 33 (hereinafter *"Findings"*).[6]

Under California law, the test of whether a plaintiff had probable cause to file a civil action has both subjective and objective components. The subjective aspect requires that the plaintiff have had an actual or honest belief in the merits of the claim.

---

because the petition was filed in bad faith. The finding of bad faith was based on misrepresentations to the bankruptcy court of assets and liabilities, inequitable treatment of one creditor, namely Armco, and failure to appear for the debtor's examination. The Ninth Circuit affirmed the ruling on the ground that the Greenes' unsecured debt exceeded the statutory limit and did not reach the question of bad faith. *See Greene v. Cohen, et al.,* 804 F.2d 145 (9th Cir.1986).

**4.** The underlying action, *Greene IA,* was dismissed for failure to state a claim, which disposition constitutes a termination favorable to Greene. *See Jaffe v. Stone,* 18 Cal.2d 146, 149, 114 P.2d 335 (1941); *see also Friedberg v. Cox,* 197 Cal.App.3d 381, 242 Cal.Rptr. 851, 853 (1987) (stating that "the criterion by which to determine which party was successful in the former action is the decree itself").

**5.** The existence of probable cause is a question of law. The reasonableness of an attorney's or

party's actions is for the Court to decide. *See Walsh v. Bronson,* 200 Cal.App.3d 259, 245 Cal. Rptr. 888 (1988); *see also Williams v. Coombs,* 179 Cal.App.3d 626, 224 Cal.Rptr. 865, 871–79 (1986) (rejecting *Weaver v. Superior Court,* 95 Cal.App.3d 166, 156 Cal.Rptr. 745 (1979)); *Kaiman v. Myers,* 189 Cal.App.3d 1251, 234 Cal. Rptr. 758, 763 (1987) (rejecting *Weaver*) (dicta).

**6.** Greene's own lawyer testified at trial that the only basis for the discrimination claims was the information Greene had provided him: that Greene was the only black in the company, perhaps in the industry at that level; that a Kentucky based corporation would not fare well before a Southern California jury in a Title VII case, and that the company had asked him to break a contract he had entered *prior* to the cancellation of the Los Angeles office. *See* T.R. at 317, 329. Greene himself stated in closing argument that it had never been his theory that Bellefonte had hired a white person to replace him after the Los Angeles move was cancelled. *See id.* at 647.

The objective aspect of the test requires that the facts and circumstances would warrant a reasonable person's belief that the charge is true. *See Bertero,* 118 Cal. Rptr. at 193, 529 P.2d 608. Thus, the initiator of a claim known to him to be groundless cannot avoid liability merely because a reasonable person might have thought that it had merit. *See id.* Similarly, the standard applied to an attorney who files a complaint on behalf of a client is whether after a reasonable investigation of the law and facts the attorney has an honest belief in the merits of the claim and whether that belief was objectively reasonable. *See Tool Research & Engin. Corp. v. Henigson,* 46 Cal.App.3d 675, 120 Cal.Rptr. 291, 297 (1975).

### a. *Subjective good faith belief*

█ In this case, the subjective aspect of the probable cause test is satisfied with respect to *both* Armco and its attorneys. At the trial of *Greene I* and *II,* Armco and Bellefonte representatives testified to their belief in all of the allegations contained in the abuse of process complaint and this Court found that the action was not filed in bad faith. *See Findings* at 33. As for Armco's attorneys, James Meeder and William Anderson, they had represented Armco and Bellefonte in matters involving the Greenes for eleven months at the time they filed the complaint. During those months, Meeder had appeared for his clients in proceedings before the EEOC and the California Unemployment Insurance Appeals Board, as well as in *Greene I* and *Greene II.* He interviewed the parties, investigated the facts and signed a complaint that contained factual allegations that he believed were true. *See Combined Declarations of James L. Meeder and Mark S. Dyl in Support of Motion of Defendants for Summary Judgment* at 5.

Greene argues that a finding of subjective good faith belief is inappropriate for three reasons. He contends first that Meeder's testimony is unreliable because he has committed perjury before the State Bar. This same argument was made and rejected at the trial of *Greene I* and *Greene II.* The Court found that Meeder did not commit perjury and that Meeder was a credible witness. The Court also found that Greene was not a credible witness. *See Findings* at 27, ¶ 82.[7]

Second, Greene contends that the Findings of Fact made in *Greene I* and *II* should be disregarded because they are the result of a fraud upon the Court. He argues that because Meeder had a role in the preparation of the Finding and Meeder is a liar, the Findings must be viewed as meaningless. Suffice it to say that Greene has already raised contentions respecting opposing counsel's participation in the preparation of the Findings before the Ninth Circuit, which rejected his argument. *See Greene v. Cohen,* No. 85–6145 (9th Cir. Oct. 24, 1986) at [804 F.2d 145 (table)].

Finally, Greene contends that because Meeder's declaration attempts to establish "state of mind", it cannot be relied on for purposes of summary judgment and that reasonable inferences can be drawn that "James L. Meeder is the biggest liar that ever walked the face of the Earth." *See Plaintiffs Opposition to Motion for Summary Judgment* at 17. Although honest belief in the merits of a claim is indeed a question to be determined by reference to the credibility of witnesses, summary judgment is appropriate here because Greene has the burden of demonstrating lack of honest belief and he has not discharged it. *Cf. Tool Research,* 120 Cal.Rptr. at 298, 529 P.2d 608 (rejecting argument that summary judgment is necessarily inappropriate in a malicious prosecution case because the

---

7. Greene also raised this argument in *Greene IX* and Judge Marshall rejected it. *See Greene IX, Memorandum Order,* at 6 (noting that the argument had also been rejected by the Ninth Circuit). Unable to put this claim to rest, Greene has subpoenaed Judge Lynch, who originally tried *Greene I,* to testify in this case on the issue of Meeder's credibility. *See* Letter from Walter Green to the Hon. Eugene Lynch (May 19,

1988). Greene has even attempted to have Meeder arrested for perjury. *See Reporter's Transcript of Proceedings,* No. 84–5129 (Mar. 18, 1985), but was thwarted in that attempt by the Los Angeles Police who informed Greene that they could not effect such an arrest without a court order. *See Reporter's Transcript of Proceedings,* No. 84–5129 (Apr. 22, 1985) at 4.

defendant's credibility is at issue). There is absolutely no evidence to support the contention that either Armco or its attorneys did not honestly believe that the factual allegations which they made were true. *Cf. Centers v. Dollar Markets,* 99 Cal.App.2d 534, 222 P.2d 136 (1950) (finding evidence that the defendant was lying and reserving the question of subjective belief for the jury). After all these years of "terribly involved" litigation, Greene has never been able to come forward with more than unsupported accusations. Thus, the Court concludes that a trial on the question of the defendants' honest belief in the merits of the abuse of process claim would be an empty exercise.

### b. *Objective Reasonableness of Belief*

■ Armco and Bellefonte were entitled to rely upon the advice of their counsel that the facts they believed to be true supported a claim of abuse of process. *See Williams v. Coombs,* 179 Cal.App.3d 626, 224 Cal. Rptr. 865 at 871 n. 6 (1986) (citing Rest.2d Torts, § 675). The only remaining question is whether their attorneys meet the objective standard that "a prudent attorney, after such investigation of the law as the circumstances warrant, would have considered the action to be tenable on the theory advanced." *Id.,* 224 Cal.Rptr. at 874. The "facts to be analyzed for probable cause are those known to the defendant at the time the underlying action was filed." *Id.* at 869 n. 4.

The theory of the defendants' abuse of process claim was that Greene's threat to engage them in a "terribly involved lawsuit" if they tried to collect the loan, and his three acts in furtherance of that threat (the filing of an EEOC complaint that contained false statements, the filing of counterclaims in *Greene I,* and the filing of *Greene II*) constituted use of the judicial process to collateral advantage. Greene has challenged the objective reasonableness of this theory on three grounds. First, that the suit was not tenable for the very reason it was dismissed by the North-

ern District—that the filing of complaints alone does not support an abuse of process claim. Second, Greene contends that an abuse of process claim that challenges the filing of an EEOC complaint violates Title VII. Finally, Greene argues that the amount of time and research the defendants expended was unreasonable.

Greene's first argument fails because at the time the abuse of process claim was filed, there was legal support for the position that the defendants had stated a claim of abuse of process.[8] The tort of abuse of process tort was developed in order to provide a remedy in cases in which "legal procedure has been set in motion in proper form, with probable cause, and even with ultimate success, but nevertheless has been perverted to accomplish an ulterior purpose for which it is not designed." W. Prosser, *Torts* 856 (4th ed. 1971). The focus of the inquiry in an abuse of process claim is whether there has been a form of extortion, with process as the threat, rather than on the formal use of the process itself. *See Spellens v. Spellens,* 49 Cal.2d 210, 317 P.2d 613 (1957). In 1981, the law in California reflected this rationale, with the focus on improper purpose and the term "process" defined broadly. *See Umansky v. Urquhart,* 84 Cal.App.3d 368, 148 Cal. Rptr. 547 (1978) (stating that "[p]rocess interpreted broadly [citations omitted] does include the filings of a complaint. It can mean either the original commencement of a suit or the processes issued collaterally"); *Younger v. Solomon,* 38 Cal.App.3d 289, 113 Cal.Rptr. 113 (1974) (stating that process "has been broadly interpreted to encompass the range of procedures incident to litigation"); *Barquis v. Merchants Collection Ass'n.,* 7 Cal.3d 94, 101 Cal.Rptr. 745, 496 P.2d 817 (1972) (finding abuse of process where complaints were filed in an improper venue for the purpose of impairing individuals' ability to defend). In 1981 the defendants could reasonably have believed that they could prove that Greene had an ulterior purpose in filing claims

---

**8.** The fact that the Northern District dismissed the complaint for failure to state a claim is not dispositive of this issue because probable cause and success are not synonymous. *See Murdock v. Gerth;* 65 Cal.App.2d 170, 150 P.2d 489 (1944).

against them and therefore could be held liable for an abuse of process.

The case that persuaded Judge Lynch in the Northern District to dismiss the abuse of process claim, *Seidner v. 1551 Greenfield Owners Ass'n.*, 108 Cal.App.3d 895, 166 Cal.Rptr. 803 (1980), is not inconsistent with the defendants' position. In *Seidner*, the Court affirmed the dismissal of an abuse of process claim, the theory of which was that the defendants had filed a suit in order to bring improper pressure to settle an already pending suit between the same parties. The Court reviewed California's abuse of process cases and determined that they all involved situations in which "the parties had gone beyond the mere filing of a lawsuit." *See id.* 166 Cal.Rptr. at 808. In particular, the *Seidner* court analyzed the California Supreme Court case of *Barquis*, 101 Cal.Rptr. 745 (discussed *supra*) as involving the filing of suits in an improper venue, not just the filing of suits. In *Seidner*, however, the plaintiff had not done anything improper in addition to the filing of a complaint. The only allegation arguably involving a threat was an attorney's comment that the existence of two lawsuits would increase pressure to settle. The *Seidner* court was concerned that if the facts before it stated a claim for abuse of process, legitimate settlement strategies might be deterred. *See id.* at 808; *accord Coleman v. Gulf Ins. Group*, 41 Cal.3d 782, 226 Cal.Rptr. 90, 95, 718 P.2d 77 (1986).

In sharp contrast to the defendants in *Seidner*, Armco alleged in its abuse of process claim that what Greene had done was improper because a threat to use a "terribly involved lawsuit" to totally avoid the payment of a debt rightfully owed is certainly not within the proper bounds of litigation. Moreover, finding appropriate the remedy of abuse of process on the facts of *Greene IA* would not have had the effect of deterring legitimate settlement strategies, as in *Seidner*. Obviously, a litigant like Greene is not offering to settle anything.

Not only was the defendants' conclusion that *Seidner* did not bar their claim reasonable, but also long after they had filed their complaint and it had been dismissed, a California appellate court found that *Seidner* did not preclude a cause of action for abuse of process where the defendant had threatened to use litigation to extort money and property from another party. *See Oren Royal Oaks Venture v. Stanman*, 160 Cal. App.3d 879, 207 Cal.Rptr. 33 (1984), *reversed and opinion withdrawn from publication, Oren Royal Oaks Venture v. Greenberg, Bernhard*, 42 Cal.3d 1157, 232 Cal.Rptr. 567, 728 P.2d 1202 (1986). Indeed, the appellate court did not discuss *Seidner* at all. It explained that the focus of the tort was the threat of improper use of process, in contrast to the tort of malicious prosecution, in which the institution of the process constitutes the tort. The court cited *Barquis, Umansky*, and *Younger* for the propositon that "process" was to be interpreted broadly and could include the filing of a complaint. Although the Supreme Court rejected this view in 1986, *see Oren Royal Oaks Venture*, 232 Cal.Rptr. at 575, 728 P.2d 1202, that the appellate court in *Oren Royal Oaks Venture* did endorse the defendants' theory is persuasive evidence that their interpretation of the law was reasonable. *Seidner* may have cast doubt on the viability of the defendants' theory and more recent cases have rendered such a theory untenable. *See, e.g., Kappel v. Bartlett*, 200 Cal.App. 3d 1457, 246 Cal.Rptr. 815 (1988). Nevertheless, as of 1981, California law on abuse of process left ample room to argue the propriety of the defendants' claim.

■ Greene's second argument—that the filing of the abuse of process claim was a violation of section 704(a) of Title VII—is also unavailing. Section 704(a) protects employees who oppose unlawful discrimination practices or participate in Title VII processes.[9] Section 704(a) provides that:

9. Section 704(a) contains two different clauses: the "participation" clause and the "opposition" clause. *See Sias v. City Demonstration Agency,* 588 F.2d 692, 694 (9th Cir.1978). At issue here is the participation clause.

It shall be an unlawful employment practice for an employer to discriminate against [an employee] ... because [the employee] had made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this subchapter.

42 U.S.C. § 2000e–(3)(a) (1982). There is no doubt that the abuse of process complaint was filed at least in part in response to the filing of an EEOC claim. It says that. *See Complaint* ¶ 14. However, there is also no doubt that Greene never believed that the defendants had discriminated against him and that he filed the EEOC claim in bad faith, for the purpose of avoiding the payment of a debt. Greene also threatened to file additional claims in other forums for the same purpose. So, the question here, is whether under these circumstances, a prudent attorney in the defendants' position would have understood § 704(a) to deprive the employer of a remedy under state tort law for this misuse of process.

In 1981 it was reasonable to conclude that § 704(a) did not bar the defendants' abuse of process claim. Although it was well settled that § 704(a) prohibited a wide variety of retaliatory practices, including discharge, *see Silver v. KCA, Inc.*, 586 F.2d 138, 141 (9th Cir.1978); withholding wages, *see Kyriazi v. Western Elec. Co.*, 469 F.Supp. 672 (D.N.J.1979), loss of work assignments, *see Minor v. Califano*, 452 F.Supp. 36, 43 (D.D.C.1978), discipline, *see Crawford v. Roadway Exp., Inc.*, 485 F.Supp. 914 (D.La.1980), and harassment, *see Hayden v. Chrysler Corp.*, 486 F.Supp. 557 (D.Mich.1980), it was not clear that the section prohibited an employer from bringing a state tort claim. Indeed some authority to the contrary existed. *See, e.g., Bartulica v. Paculdo*, 411 F.Supp. 392, 397 n. 3 (W.D.Mo.1976); *Pettway v. American Cast Iron Pipe Co.*, 411 F.2d 998, 1007 n. 22 (5th Cir.1969) (stating "[w]e in no way imply that an employer is preempted by Section 704(a) from vindicating his reputation through resort to a civil action through malicious defamation"). *But see EEOC v. Virginia Carolina Veneer Corp.*, 495 F.Supp. 775, 778 (D.C.Va.1980) (holding that § 704(a) prohibits the filing of a retaliatory defamation action). In addition, although it was clear that protection from retaliatory practices was available even where the employee's belief in the merits of his case was mistaken, *see Sias v. City Demonstration Agency*, 588 F.2d 692, 695 (9th Cir.1978), it was unclear that a false and malicious claim was protected. *Compare Pettway*, 411 F.2d at 1006–07; *Virginia Carolina Veneer Corp.*, 495 F.Supp. at 778, *with Monteiro v. Poole Silver Co.*, 615 F.2d 4 (1st Cir.1980) (holding that the opposition clause of § 704(a) does not protect an employee who makes unfounded claims in order to excuse noncompliance with legitimate employer demands). Subsequent case law developments reveal that these questions remain unanswered. *See, e.g., EEOC v. Levi Strauss*, 515 F.Supp. 640, 644 (N.D.Ill.1981); *see also Proulx v. Citibank, N.A.*, 659 F.Supp. 972, 978 n. 12 (S.D.N.Y.1987) (noting that "[t]he viability of an employer's suit for defamation against a charging employee within the context of Title VII does not appear to have engaged the attention of the Supreme Court or the Second Circuit," and indicating in dicta that it would not find that Title VII preempts all such activity); *Yatvin v. Madison Metro. School Dist.*, 840 F.2d 412, 418 (7th Cir.1988) (observing that there is no right to harass an employer with frivolous suits and that an employer is not required to tolerate the commission of torts against him by employees).[10] The defendants' conclusion that Title VII did not bar an abuse of process claim to remedy a former employee's bad faith claims against his employer, was reasonable.

Finally, the Court rejects Greene's contention that the defendants' research efforts were inadequate. The reasonable-

---

10. *Cf. Power Systems, Inc. v. NLRB*, 601 F.2d 936 (7th Cir.1979) (holding that state malicious prosecution claim did not violate the NLRA, although recognizing the potential chilling effect of such claims). Of course, as the district court in *Proulx* pointed out, the protections afforded by Title VII are substantially broader than those under the Fair Labor Standards Act and the National Labor Relations Act. *See Proulx*, 659 F.Supp. at 977 n. 11.

ness of the investigation rests not on what the attorneys should or might have done, but rather on the reasonableness of what they actually did. *See Walsh v. Bronson,* 200 Cal.App.3d 259, 245 Cal.Rptr. 888 (1988). The defendants have established that they conducted a reasonable investigation of the law and facts before bringing the suit, as a comparison of Mr. Meeder's efforts with those of attorneys in cases in which probable cause was lacking readily reveals. For example, in *Williams,* 224 Cal.Rptr. at 865, the defendant attorney filed suit based solely on his client's word, without investigation of the facts, and founded on a completely groundless theory that a simple reading of the relevant statute would have indicated could not succeed. *See id.* at 875–77. In contrast, Mr. Meeder had interviewed the relevant parties over the course of his eleven month relationship with them, spent ten hours researching the law of abuse of process, and consulted with other attorneys in his firm. *Cf. Tool Research,* 120 Cal.Rptr. at 297 (finding attorneys' investigation of facts and law reasonable and industrious where they discussed the case with previous counsel and conducted independent research into the facts). This Court concludes that the defendants' efforts were reasonable.

### 2. The Defendants Acted Without Malice

■ Even if the Court had found probable cause lacking, the result in this case would be no different because there is no genuine dispute about the existence of malice. Although in many cases, the question of malice will require credibility determinations that are inappropriate for summary judgment, this case is not one of them. The motivation of Armco and its attorneys in filing the abuse of process claim has been explored in depth before this and other tribunals. Each side has had the opportunity to cross examine the other with respect to this issue and this Court has already found that the claim was not filed in retaliation, but rather because Greene had refused to pay back the money he owed to his former employer, threatened to use the legal system if the employer tried to get it back, and then proceeded to do so. One of

the principal purposes of summary judgment is to "isolate and dispose of factually unsupported claims," *see Celotex v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The claim of malice is such a claim. Greene has had his day in court. Indeed, he has had a considerable number. It is time to put an end to this dispute.

### B. *Remaining Claims*
#### 1. Interference with Prospective Business Advantage

■] Greene's cause of action for interference with prospective business advantage is based on defendants' communications with the State Bar and Greene's subsequent denial of admission to the Bar. However, these communications are absolutely privileged under California state law, *see Chen v. Fleming,* 147 Cal.App.3d 36, 194 Cal.Rptr. 913, 914 (1983); *see also Lebbos v. State Bar of California,* 165 Cal. App.3d 656, 211 Cal.Rptr. 847, 854–55 (1985) (discussing scope of the privilege). Therefore, summary judgment as to this cause of action must be granted.

#### 2. Violations of § 1981

■] Greene's cause of action for a violation of § 1981 is based on his employment termination and is precluded by the judgment entered in *Greene I* and *Greene II.* The essential elements of Greene's § 1981 claim were actually litigated and necessarily decided in those cases and cannot be relitigated. *See Allen v. McCurry,* 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). Greene has presented no evidence to support his contention that the judgments in *Greene I* and *II* are not entitled to preclusive effect because they were the product of fraud. The indications of fraud that he points to, Meeder's alleged perjury before the Bar and Meeder's alleged participation in the findings of this Court, have been addressed by this Court and by the Ninth Circuit. *See supra,* at n. 7. In the absence of any indication that those decisions should not be given preclusive effect, summary judgment as to the § 1981 claim must be granted.

### 3. Additional Discovery under 56(f)

Greene's contention that he is entitled to further discovery because most of the information relevant to this case is in the hands of the defendants is disingenuous. Greene has had virtually unlimited opportunities to discover evidence relevant to this litigation. If he did not pursue those opportunities that is his responsibility. Moreover, on the facts before the Court, it is difficult to see how even a litigant as tireless as Greene could think of anything else to do or say to postpone the ultimate resolution of this litigation.

### CONCLUSION

There are unquestionably too many employers who engage in discriminatory conduct toward their employees and then retaliate against the employees for complaining about it. The protection of employees against such practices by employers is of the first importance, but it is often made difficult by the complexity of the factual setting presented to the Court. Employment discrimination cases involve tough questions of credibility made more difficult because the witnesses usually work side by side, day by day. The witnesses see the same situations, but more often than not, from completely different points of view. Too many times, their testimony reflects the existence of genuine stress and anxiety created by their relationship with both sides in the case. Because emotions run high in this kind of litigation, it is often hard to decide which version of the employment story to accept. Here, however, there is no such problem.

This is the story of an employee who took advantage of his employer. He manipulated and deceived the employer and when the employer sought repayment of monies advanced to him, he claimed discrimination. That claim was made by him without any belief in its merits, simply as a strategy to frustrate collection of the debt. That is a grievous wrong to the system which exists to protect against discrimination in the workplace.

Greene is highly sophisticated, intelligent and articulate. His appearance and manner are disarming. It is only on a careful analysis of all of the facts of this seemingly endless litigation that his strategy becomes apparent. He has indeed entangled his employer in a long and "terribly involved lawsuit" just as he said he would. His cynical use of the system may have been offensive, but it unquestionably has worked to date. It is now time to put an end to it.

Accordingly, IT IS ORDERED that the defendants' motion for summary judgment is granted.

### JUDGMENT

The motion of defendants Armco, Inc., Brobeck, Phleger & Harrison, James L. Meeder and William C. Anderson for summary judgment or, in the alternative, for order pursuant to Federal Rule of Civil Procedure 56(d), came on for hearing on May 2, 1988 before the Honorable Mariana R. Pfaelzer. The Court, having considered the papers filed and the argument of counsel, and, being fully advised, having found that there is no genuine issue of fact to be submitted for trial, and having determined that defendants are entitled to judgment as a matter of law,

IT IS ORDERED, ADJUDGED AND DECREED that the motion of defendants for summary judgment is in all respects granted, and that the complaint in this action and each claim for relief therein be and hereby is dismissed.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that defendants shall recover their costs incurred in this action.